# VON BAUMBACH, COLLECTOR OF INTERNAL REVENUE, *v.* SARGENT LAND COMPANY.

# VON BAUMBACH, COLLECTOR OF INTERNAL REVENUE, *v.* SUTTON LAND COMPANY.

# VON BAUMBACH, COLLECTOR OF INTERNAL REVENUE, *v.* KEARSARGE LAND COMPANY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

Nos. 286, 287, 288.    Argued December 13, 14, 1916.—Decided January 15, 1917.

Corporations organized under the laws of Minnesota, not for charitable or eleemosynary purposes but for the pecuniary advantage of their shareholders, *held,* "organized for profit" within the meaning of the Corporation Tax Law of August 5, 1909.

The decision whether a corporation is carrying on business within the meaning of the Corporation Tax Law must depend in each instance upon the particular facts before the court; no particular amount of business is required.

A corporation which has not reduced its activities to owning and holding property and the distribution of its avails, but maintains its organization for continued efforts in pursuit of profit and for such activities as are therein essential, is carrying on business within the meaning of the act.

Respondent corporations, besides receiving and distributing among their shareholders the royalties from a number of outstanding long term "mining leases," employed another company to inspect the lessees' operations and keep them to their contracts, made some mining explorations at expense on other parts of their properties, sold or leased other parcels and sold some timber, *held*, that they were carrying on business within the meaning of the Corporation Tax Law.

*Quære:* Whether this court, in determining whether royalties under mining leases are income subject to the Corporation Tax Law, is constrained to follow the decisions of the highest court of the State in which the leased property is situate holding that such royalties are rents and profits.

The "mining leases" involved in these cases, were not equivalent to sales of property; and the moneys paid by the lessees to the respondents were not converted capital, but rents or royalties, and as such were income, proper to be included in measuring their taxes under the Corporation Tax Law. *Stratton's Independence* v. *Howbert*, 231 U. S. 399; *Stanton* v. *Baltic Mining Co.*, 240 U. S. 103.

The depletion of a mine resulting from the removal of ore in the course of its operation is not a "depreciation of property" for which a deduction may be made under the Corporation Tax Law.

219 Fed. Rep. 31, reversed.

THE case is stated in the opinion.

*Mr. Assistant Attorney General Wallace* for petitioner: The respondents were "doing business" within the meaning of the Corporation Tax Act. The cases fall within *Mitchell* v. *Clark Iron Co.*, 220 U. S. 107, 170; not within *United States* v. *Emery, Bird, Thayer Realty Co.*, 237 U. S. 28. In the cases at bar the companies were

incorporated for the very purpose of getting, in the operation and management of mining leases, the advantage of a legal person over minors and undivided interests. The corporations supplied the main capital—the land. The lessees supplied the labor and, so to speak, the working capital. The product was divided between them. This arrangement constituted a community of interest between lessors and lessees and required the corporations to do what they did—namely, exercise a constant supervision over the business to see that they obtained their just royalties. This shows that the object of a mining lease is to divide up the mining business, the lessor furnishing most of the capital.

A mining lease is not a sale on installments, and the royalties thereon are income. See the full remarks of Lord Blackburn in *Coltness Iron Co.* v. *Black*, 6 App. Cas. 315, 335. As for the Pennsylvania cases relied on by the court below (219 Fed. Rep. 38, 39), see *Denniston* v. *Haddock*, 200 Pa. St. 426, 428; they oppose all the other authorities. Before the rights of the United States accrued, the Supreme Court of Minnesota had decided, in *State* v. *Evans*, 99 Minnesota, 220, that a mining lease is not a sale but a lease, and that the royalties on it are true rents or profits accruing from the land, and this was affirmed in *Boeing* v. *Owsley*, 122 Minnesota, 190, and in *Minnesota* v. *Royal Mineral Association*, 156 N. W. Rep. 128, notwithstanding the decision below. The decision in *State* v. *Evans* made a rule of property in Minnesota, and the Court of Appeals was bound to follow it.

The royalties or rentals, when received, constituted gross income of the lessors. *Mitchell* v. *Clark Iron Co.*, *supra*. Whether these "royalties" are called payments by installment of a debt, or conversion of capital from one form to another, they were, nevertheless, received by the companies during the taxing years from the business done by them with the advantages inherent in a corporate

organization. They were the gross income of the companies from such business, since gross income is nothing but gross money receipts or revenue. They are therefore within the very language of the act. *Anderson* v. *Forty-two Broadway Co.*, 239 U. S. 69. The distinction is plain between a casual conversion of capital, *Secretary of State* v. *Scoble* (1903), 1 K. B. 494 (1903) A. C. 299; *Stevens* v. *Hudson's Bay Co.*, 101 Law Times Rep. 96; *Gray* v. *Darlington*, 15 Wall. 63, 66, and a conversion occurring in the regular course of business. *Stratton's Independence, Ltd.*, v. *Howbert*, 231 U. S. 399, 414, 415; *Stanton* v. *Baltic Mining Co.*, 240 U. S. 103, 114.

"Depreciation" cannot be "allowed" under the act unless, and only to the extent that, actual deductions or payments have been made on account of it. Just as "income" must be an actual, not a hypothetical, receipt, so "outgo" must be an actual, not a hypothetical, payment. It seems clear that "depreciation," as defined by the act, is within the class "losses *actually* sustained within the year;" and it seems equally clear that a loss to be "*actually* sustained" must have caused some actual disservice or damage to the person concerned. *Baldwin Locomotive Works* v. *McCoach*, 215 Fed. Rep. 967, 969; 221 Fed. Rep. 59.

Depletion of capital cannot be deducted as "depreciation." The latter term does not naturally include the former. In the case of a mine the machinery, shafts, etc., depreciate, but we do not say that the deposit of mineral depreciates by being sold. The English decisions all seem to maintain, or, at least, countenance the view that depletion of capital cannot be deducted as depreciation. *Lee* v. *Neuchatel Asphalt Co.*, 41 Ch. Div. 1; *Wilmer* v. *McNamara & Co., Ltd.* (1895), 2 Ch. 245; *Coltness Iron Co.* v. *Black*, 6 App. Cas. 315; *Alianza Co.* v. *Bell* (1904), 2 K. B. 666 (1905), 1 K. B. 184 (1906), A. C. 18; *Kauri Timber Co., Ltd.*, v. *Commr. of Taxes* (1913), A. C. 771, 777. See

Boutwell on the direct and excise tax system of the United States, pp. 273, 274; *Stratton's Independence* v. *Howbert*, 207 Fed. Rep. 419, 421, 422; *Commonwealth* v. *Ocean Oil Co.*, 59 Pa. St. 61; *Commonwealth* v. *Penn Gas Coal Co.*, 62 Pa. St. 241; *Van Dyke* v. *Milwaukee*, 159 Wisconsin, 460. We know of no authority holding depletion of capital equivalent to "depreciation" other than the decision of the court below and that in the *Nipissing Mines Case*, 202 Fed. Rep. 803.

*Mr. John R. Van Derlip*, with whom *Mr. Burt F. Lum* and *Mr. Kenneth Taylor* were on the brief, for respondents.

The respondents were not corporations "organized for profit." The sole purpose of their organization was the liquidation of the assets contributed, in undivided portions, by the owners, with a view to the partition of the whole and to enable them to realize the money equivalent of their respective contributions, but with no view to dealing, speculating, trading, or gain. The act means that a corporation, to be subject to taxation, must be organized to make profit from the carrying on or doing of business. *Lewellyn* v. *Pittsburgh, B. & L. E. Ry. Co.*, 222 Fed. Rep. 177, 183, 184; *Smith* v. *Anderson*, L. R., 15 Ch. Div. 247. The words "organized for profit," do not merely distinguish between charitable corporations and all others. The suggestion that any corporation organized by private persons for their own advantage or interest is organized for profit is untenable. Such an interpretation is opposed to the common acceptation of the words, and renders them idle. For it is not sensibly conceivable that any persons would organize a corporation, unless it would be of some advantage to them. The tax is not a tax on incomes, nor on corporations which merely receive incomes from property. *Zonne* v. *Minneapolis Syndicate*, 220 U. S. 187; *McCoach* v. *Minehill &c. R. R. Co.*, 228 U. S. 295; *Flint* v. *Stone-Tracy Co.*, 220 U. S. 149, 152. The receipt of inter-

est, rent, or other income is simply a concomitant of property ownership. *Pollock* v. *Farmers' Loan & Trust Co.*, 158 U. S. 601, 625, 626. "Profit" in this act signifies the gain from a commercial or other active business, involving "ordinary and necessary expenses" in the way of rentals, salaries and other outgoes and obligations. *Gray* v. *Darlington*, 15 Wall. 63; *People* v. *Board of Supervisors*, 4 Hill, 20. If the words "organized for profit" be ignored, the act would apply to every corporation carrying on or doing business, which, concededly, it does not.

Respondents were not "carrying on or doing business" during the years for which the tax was assessed. There was no substantial activity other than the receipt of moneys payable to them under the outstanding mining contracts and the distrioution of such moneys to their stockholders. It was only because the act was limited to corporations doing business that its constitutionality was sustained. *Flint* v. *Stone-Tracy Co., supra.*

In *Mitchell* v. *Clark Iron Co.*, 220 U. S. 107, 170, the question whether the Clark Iron Company was "doing business" within the meaning of the statute was not an issue. This court assumed that the company was continuing, after the passage and approval of the act, to make leases from time to time, an activity, which, if it existed, may be conceded to be doing business within the statute.

The amendment of the articles of incorporation in these cases conforms completely in its effect to the amendment made by the Minneapolis Syndicate in the *Zonne Case, supra,* and also in *Abrast Realty Co.* v. *Maxwell*, 206 Fed. Rep. 333; *s. c.*, 218 Fed. Rep. 457.

In every case the question is determined not by the power to act, but by the activities engaged in by the corporation. *Flint* v. *Stone-Tracy Co.*, 220 U. S. 107, 145, 151; *United States* v. *Emery, Bird, Thayer Realty Co.*, 237 U. S. 28, 32; *Minehill &c. R. R. Co.* v. *McCoach*, 192

Fed. Rep. 670, 672; *Public Service Ry. Co.* v. *Herold,* 227
Fed. Rep. 500; *State Line Co.* v. *Davis,* 228 Fed. Rep.
246, 249.

Owning and caring for property and division of the
income from it is not "doing business." Business must be
actually done. So far as concerns the mining property, the
contracts disqualified respondents from "doing business."
The business was all done by the lessees. The petty
licenses to squatters and the two or three sales of burned
timber to save its value from destruction were of course
merely incidental and negligible. So were the sales of
land, which were trivial, incidental to ownership and made
under a contract antedating respondents' ownership.
Sales, or receipts of principal, interest or rents, as in-
cidents of ownership, are not doing business.

Since the receipts of money under the mining con-
tracts represented merely a conversion of capital assets
without gain or profit, they were not "gross income."
Respondents took and held the legal title, subject to the
outstanding contracts, pursuant to which they could re-
ceive, and anticipate receiving, nothing except the moneys
which should become payable thereunder. Even if the
contracts were not sales of the ore, it does not follow that
the receipts were income. Counsel here distinguished
English cases, and cited *Caldwell* v. *Fulton,* 31 Pa. St. 475;
*Harlan* v. *Lehigh C. & N. Co.,* 35 Pa. St. 287; *Citizens' Gas
Co.* v. *Whitney,* 232 Pa. St. 592, and many other Penn-
sylvania decisions, and *Hook* v. *Garfield Coal Co.,* 112
Iowa, 210; *Wilson* v. *Youst,* 43 W. Va. 826; *Selvey* v.
*Grafton Coal Co.,* 72 W. Va. 680; *Manning* v. *Frazier,* 96
Illinois, 279. The contracts are analogous to executory
contracts of sale. *Genet* v. *D. & H. Canal Co.,* 136 N. Y.
593; *Browning* v. *Boswell,* 215 Fed. Rep. 826; *Kansas
Natural Gas Co.* v. *Board,* 75 Kansas, 335.

The decisions of the Minnesota Supreme Court on the
nature of such "mining leases" are not binding as a rule of

property or otherwise. All the cases cited to the contrary concerned private, disputes in most instances governed by local laws or rules of property, and in none of them was the construction of a federal statute involved. The law in question is a federal taxing law which under the Constitution must operate with uniformity to be valid, and in applying it the federal courts must follow their own judgment.

Gross income and gross receipts are different things. There is no tax unless there are net profits. *Flint* v. *Stone-Tracy Co.,* 220 U. S. 145. If the receipts from the leases were income there would be no distinction under the act between income and "property or invested capital."

That proceeds of sales of capital are not income, see: *Stevens* v. *Hudson's Bay Co.,* 101 L. T. Rep. 96; *Secretary of State for India* v. *Scoble,* 89 L. T. Rep. 1; *Baldwin Locomotive Works* v. *McCoach,* 215 Fed. Rep. 967, 969.

That is capital which is owned by a taxpayer at the time of the incidence of the tax, and to the extent of its value at that time, money into which the property is afterward converted, is not to be considered as income which can form the basis of taxation.

The respondents were entitled to deduct the amount of the royalties as "a reasonable allowance for depreciation of property," under the act. Omission to enter them in a depreciation account was not material, and the Commissioner's regulation to the contrary was an unlawful extension of the act. The question of depreciation was one of fact. *Bailey* v. *Railroad Company,* 106 U. S. 109. As a fact the capital value of the contracts, as it was when the act took effect, was diminished by the amount of the subsequent payments. This was "depreciation," under the act. See the Income Tax Law of September 8, 1916,. §§ 10 and 12, 39 Stat. 756.

*Stratton's Independence* v. *Howbert* is consistent with the foregoing propositions.

MR. JUSTICE DAY delivered the opinion of the court.

These three cases were argued and submitted together and involve practically the same facts. Suits were brought by the corporations named in the United States District Court for the District of Minnesota against the Collector of Internal Revenue, to recover certain taxes, paid under protest, assessed under the Corporation Tax Law of 1909, 36 Stat. 11, 112, for the years 1909, 1910 and 1911. The judgments in the District Court were for the respondents (207 Fed. Rep. 423), which judgments were affirmed in the Circuit Court of Appeals. 219 Fed. Rep. 31.

In 1890, John S. Pillsbury, George A. Pillsbury and Charles A. Pillsbury, doing business together as John S. Pillsbury & Company, were the owners of large tracts of lands in northern Minnesota, which had been acquired for the timber and from which the timber had been cut, being valuable after such severance of the timber for the mineral deposits contained therein. In the year named, the Pillsburys entered into an arrangement with John M. Longyear and Russell M. Bennett, authorizing the latter two to explore the lands for iron deposits. In 1892, Longyear and Bennett having discovered valuable deposits of iron ore, a half interest in something over ten thousand acres of the lands was conveyed to them, the lands thereafter being owned by the Pillsburys, John, George and Charles, each an undivided sixth, and John M. Longyear and Russell M. Bennett each an undivided fourth. In the year 1901, the Pillsburys having died, these corporations were formed under the laws of Minnesota. In 1906, the ownership of these leased lands was vested in the three corporations named as respondents in the proceedings. As originally organized, the nature of the business was stated to be "the buying, owning, exploring and developing, leasing, improving, selling and dealing in, lands, tenements and hereditaments, and the doing of all things

necessary or incidental to the things above specified."
In December, 1909, the articles of incorporation were
amended to read as follows: "The general purpose of the
corporation is to unite in one ownership the undivided
fractional interests of its various stockholders in lands,
tenements and hereditaments, and to own such property,
and, for the convenience of its stockholders, to receive,
and distribute to them, the proceeds of any disposition
of such property at such times, in such amounts, and
in such manner, as the board of directors may deter-
mine."

All of the mining leases, hereinafter mentioned, with
the exception of a contract with the Van Buren Mining
Company, were executed before the organization of the
corporations. Each of these instruments provided that
the owners of the property demised to the lessees, exclu-
sively, all the lands covered by the descriptions for the
purpose of exploring for, mining and removing the mer-
chantable iron ore which might be found therein for and
during the period named, usually fifty years. The lessees
were given exclusive right to occupy and control the
demised premises and to erect all necessary buildings,
structures and improvements thereon. Right was re-
served to the lessors to enter for the purpose of measuring
the amount of ore mined and removed and making ob-
servations of the operations in the mines. The lessees
agreed to pay, in most cases, twenty-five cents per ton for
all ore mined and removed, and to make such payments
monthly for ore mined and shipped during the preceding
month. The lessees agreed to mine and ship a specified
quantity of ore in each year, and, in default of this, to pay
the lessors for the minimum amount specified, and take
credit therefor and apply such sums upon ore mined and
shipped thereafter in excess of such minimum. The
lessees were to pay the taxes and to keep the property free
from encumbrances and liens. Right was reserved to

terminate the contract upon the failure of the lessees to comply with the terms thereof.

The form of the leases is shown in Exhibits 15 and 16, which were not in the printed record, owing to their length, but copies of which, pursuant to stipulation, have been sent to this court. An examination of Exhibit 16 shows that the lessees had the right to terminate and surrender the lease by giving the lessors, or those having their estate in the premises, sixty days' written notice, and executing sufficient conveyances releasing all interest and right of the lessees in the premises with any improvements thereon, and surrendering the same in good order and condition, etc., and that thereupon all liability of the lessees to taxes subsequently assessed on the demised premises or for rent thereof thereafter to accrue, or royalty on ores therefrom except on account of ores removed, should cease and determine; the lessees to be liable for all ores removed from the premises not theretofore paid for, and to pay for the premises rent or royalty for the year in which termination should be made, or the portion thereof which should have expired, at the rate of $12,500.00 per annum.

Since their organization the corporations have disposed of certain lands and have also disposed of the stumpage on some timber lands. Certain parcels were rented and leased, and a village was allowed to use part of the land for schoolhouse purposes, as well as another part for a public park.

To insure the proper carrying on of the mining operations, the companies employed another corporation, engaged in engineering and inspection of ore properties, to provide supervision and inspection of the work upon the respondents' properties, for which the inspecting company was paid from month to month, as statements were rendered.

The companies were assessed upon their gross income,

being the entire receipts of the companies from royalties on the leases collected in the years 1909, 1910, and 1911, and some sums received from the sales of lots, lands and stumpage, from which expenses and taxes were deducted, but no deduction was made upon account of the depletion of the ore in the properties, or on account of such sales.

The brief for the respondents states that these cases present for consideration four questions, which are:

"1. Are the respondents corporations organized for profit?

"2. Were the respondents carrying on or doing business during the years 1909, 1910, 1911?

"3. Were moneys received by the respondents during those years in payment for iron ore, under the contracts covering their mineral lands, gross income, or did they represent, in whole or in part, the conversion of the investment of the corporations from ore into money?

"4. If such moneys were gross income, are the respondents entitled to make any deduction therefrom on account of the depletion of their capital investment?"

As to the first question, whether these corporations were organized for profit, there can be no difficulty. They certainly do not come within the exceptional character of charitable or eleemosynary organizations excepted from the operation of the act. We need not dwell upon the obvious purpose of these corporations, organized under the provisions of the Minnesota statute concerning companies organized for profit, to pursue gain and to profit because of their operations.

As to the second question: were the respondents carrying on business, within the meaning of the Corporation Tax Act? This question was dealt with by this court in the first of the Corporation Tax Cases, *Flint* v. *Stone-Tracy Company*, 220 U. S. 107. As the tax was there held to be assessed upon the privilege of doing business in a corporate capacity, it became necessary to inquire what

it was to do business, and this court adopted with approval the definition, judicially approved in other cases, which included within the comprehensive term "business" "that which occupies the time, attention and labor of men for the purpose of a livelihood or profit."

In that case a number of realty and mining companies were dealt with, and the Park Realty Company, organized to deal in real estate, and engaged at the time in the management and leasing of a certain hotel, was held to be engaged in business. It was also held that the Clark Iron Company, organized under the laws of Minnesota, and owning and leasing ore lands for the purpose of carrying on mining operations, and receiving a royalty depending upon the quantity of ore mined, was engaged in business.

At the same time, and decided with the main Corporation Tax Case, this court held, in the case of *Zonne* v. *Minneapolis Syndicate*, 220 U. S. 187, that a corporation which owned a piece of real estate which had been leased for 130 years, at an annual rental of $61,000, and which had amended its articles of incorporation so as to limit its purposes to holding the title to the property mentioned, and, for the convenience of its stockholders, to receiving and distributing from time to time the rentals that accrued under the lease and the proceeds of any disposition of the land, was not engaged in doing business within the meaning of the act, by reason of the fact that the corporation had practically gone out of business and had disqualified itself from any activity in respect thereto.

The act next came before this court in the case of *McCoach, Collector*, v. *Minehill & Schuylkill Haven R. R. Co.*, 228 U. S. 295, in which it was held, distinguishing the case of the Park Realty Company, *supra*, and applying the case of *Zonne* v. *Minneapolis Syndicate*, *supra*, to the facts before the court, that a corporation which had leased all its property to another, and was doing only what was necessary to receive and distribute the income therefrom

among stockholders, was not doing business within the meaning of the act.

In *United States* v. *Emery, Bird, Thayer Realty Co.*, 237 U. S. 28, this court held that a corporation which merely kept up its organization, distributing rent received from a single lessee, was not doing business within the meaning of the act.

It is evident, from what this court has said in dealing with the former cases, that the decision in each instance must depend upon the particular facts before the court. The fair test to be derived from a consideration of all of them is between a corporation which has reduced its activities to the owning and holding of property and the distribution of its avails and doing only the acts necessary to continue that status, and one which is still active and is maintaining its organization for the purpose of continued efforts in the pursuit of profit and gain and such activities as are essential to those purposes.

From the facts clearly established in these cases, we think these corporations were doing business, within the meaning of the act. They were organized for the purposes stated, and their activities included something more than the mere holding of property and the distribution of the receipts thereof. As was found by the District Court, the evidence shows that these three companies sold, during each of the years named, quantities of real estate, and the same were not small. They sold stumpage from some of the properties which had been burned over, leased certain properties in the village of Hibbing, and granted leases to squatters. One of the companies made explorations and incurred expenses in the matter of test pits. They employed another company to see that the mining operations were properly carried on, and that the lessees lived up to the engagements of their contracts. "All these things indicate," said the learned District Judge, "the doing of and engaging in business. It [the corporation] was doing

the business of handling a large property, selling lots, and seeing that the lessees lived up to their contracts. If that is not engaging in business, I do not know what is." We agree that it certainly was doing business, and, as the Corporation Tax Act requires no particular amount of business in order to bring a company within its terms, we think these activities brought the corporations in question within that line of decisions in this court which have held such corporations were doing business in a corporate capacity within the meaning of the law.

Next, is it true, as contended by the Government, that the payments for ore mined, under the contracts covering the mineral lands, are income, within the meaning of the act; or do they represent the conversion of the investment of the corporations from ore into money?

The nature of these mining leases has been the subject of some difference of opinion in the courts. The Circuit Court of Appeals in this case took the view announced in some of the earlier cases, notably in Pennsylvania, that the leases were such in name only, and were in fact conveyances of the ore in place as part of the realty, and that the so-called royalties merely represented payments for so much of the land and were in no just sense income, but mere conversions of the capital.

These lands are situated in Minnesota, and this character of lease has long been familiar in that State, as a means of securing the development and operation of mining properties. Some years before the passage of the Corporation Tax Act, the Supreme Court of Minnesota had dealt with the character of such instruments. In the case of *State* v. *Evans*, 99 Minnesota, 220, that court, after a review of the English and American cases, said (p. 227):

"The propriety of a lease for the purpose of developing and working mines is recognized by all of the cases, and the rule established by the great weight of authority that such leases do not constitute a sale of any part of the land,

and, further, that iron or other materials derived from the usual operation of open mines or quarries, constitute the rents and profits of the land, and belong to the tenant for life or years, and to the mortgagor after sale on foreclosure, and before the expiration of the time for redemption. The rule, however, has no application to unopened mines in the absence of a contract, express or implied, for opening and leasing them."

The same doctrine was held in *Boeing* v. *Owsley*, 122 Minnesota, 190, and in the late case of *State* v. *Royal Mineral Association*, 132 Minnesota, 232, in which the decision of the Circuit Court of Appeals in this case, that such leases were merely conveyances of the ore in place, was brought to the attention of the court, and that conclusion expressly denied, the Supreme Court of Minnesota saying:

"We adhere to the doctrine of the *Evans* and *Boeing Cases,* and hold these instruments leases. It follows logically that the amounts stipulated to be paid by the lessees are rents, and they were expressly held by this court to be rents in the *Boeing Case, supra,* a case which involved a construction of the very leases now before the court. They are 'the compensation which the occupier pays the landlord for that species of occupation which the contract between them allows.' Lord Dennison, in *Queen* v. *Westbrook,* 10 Q. B. 178, 205."

These conclusions of the Supreme Court of Minnesota are not only made concerning contracts in that State, such as are here involved, but are supported by many authorities.[1] Ordinarily, and as between private parties, there

---

[1] *Raynolds* v. *Hanna,* 55 Fed. Rep. 783, 800, 801; *Tennessee Oil &c. Co.* v. *Brown,* 131 Fed. Rep. 696, 700 (opinion by Lurton, J.); *Browning* v. *Boswell,* 215 Fed. Rep. 826, 834; *Backer* v. *Penn Lubricating Co.,* 162 Fed. Rep. 627; *Young* v. *Ellis,* 91 Va. 297; *Gartside* v. *Outley,* 58 Ill. 210; *Genet* v. *Delaware and Hudson Canal Co.,* 136 N. Y. 593, 602; *Lacey* v. *Newcomb,* 95 Iowa, 287; *Austin* v. *Huntsville Coal & Mining Co.,* 72 Mo. 535; *Brown* v. *Fowler,* 65 Ohio St. 507, 521; *Queen* v. *Westbrook,* 10 Q. B. 178, 205.

is no question of the duty of the federal court to follow these decisions of the Minnesota Supreme Court, as a rule of real property long established by state decisions. *Kuhn* v. *Fairmont Coal Company*, 215 U. S. 349, 360. Whether in considering this federal statute we should be constrained to follow the established law of the State, as is contended by the Government, we do not need to determine. The decisive question in this case is whether the payments made as so-called royalties amount to income so as to bring such payments within the scope of the Corporation Tax Act of 1909. The prior decisions of this court in *Stratton's Independence* v. *Howbert*, 231 U. S. 399, and *Stanton* v. *Baltic Mining Company*, 240 U. S. 103, in which the *Stratton Case* was followed and approved, are decisive of this question. In the *Stratton Case*, certain questions were certified to this court from the Circuit Court of Appeals for the Eighth Circuit. The case was tried upon an agreed statement of facts, from which it appeared, "as to the year 1909, that the company extracted from its lands during the year certain ores bearing gold and other precious metals, which were sold by it for sums largely in excess of the cost of mining, extracting, and marketing the same, that the gross sales amounted to $284,682.85, the cost of extracting, mining and marketing amounted to $190,939.42, and 'the value of said ores so extracted in the year 1909, when in place in said mine and before extraction thereof, was $93,743.43.' With respect to the operations of the company for the year 1910, the agreed facts were practically the same, except as to dates and amounts. It does not appear that the so-called 'value of the ore in place,' or any other sum, was actually charged off upon the books of the company as depreciation." The Circuit Court of Appeals certified three questions to this court: "I. Does Section 38 of the Act of Congress, entitled 'An Act to provide revenue, equalize duties, and encourage the industries of the United States, and for other purposes,'

approved August 5, 1909 (36 Stat., p. 11), apply to mining corporations? II. Are the proceeds of ores mined by a corporation from its own premises income within the meaning of the aforementioned Act of Congress? III. If the proceeds from ore sales are to be treated as income, is such a corporation entitled to deduct the value of such ore in place and before it is mined as depreciation within the meaning of Section 38 of said Act of Congress?" This court answered the first and second questions certified in the affirmative, and the third question in the negative. In that case, as here, it was contended that the proceeds of the mining operations resulting from a conversion of the capital represented by real estate into capital represented by cash are in no true sense income. As to this contention, this court said:

"The peculiar character of mining property is sufficiently obvious. Prior to development it may present to the naked eye a mere tract of land with barren surface, and of no practical value except for what may be found beneath. Then follow excavation, discovery, development, extraction of ores, resulting eventually, if the process be thorough, in the complete exhaustion of the mineral contents so far as they are worth removing. Theoretically, and according to the argument, the entire value of the mine, as ultimately developed, existed from the beginning. Practically, however, and from the commercial standpoint, the value—that is, the exchangeable or market value—depends upon different considerations. Beginning from little, when the existence, character and extent of the ore deposits are problematical, it may increase steadily or rapidly so long as discovery and development outrun depletion, and the wiping out of the value by the practical exhaustion of the mine may be deferred for a long term of years. While not ignoring the importance of such considerations, we do not think they afford the sole test for determining the legislative intent."

This court held that it was not correct to say that a mining corporation was not engaged in business, but was merely occupied in converting its capital assets from one form to another, and that while a sale outright of a mining property might be fairly described as a conversion of the capital from land into money, the process of mining is, in a sense, equivalent to a manufacturing process, and however the operation shall be described, the transaction is indubitably "business" within the meaning of the Act of 1909, and the gains derived from it are properly the income from business, derived from capital, from labor, or from both combined. Further, "as to the alleged inequality of operation between mining corporations and others, it is of course true that the revenues derived from the working of mines result to some extent in the exhaustion of the capital. But the same is true of the earnings of the human brain and hand when unaided by capital, yet such earnings are commonly dealt with in legislation as income. So it may be said of many manufacturing corporations that are clearly subject to the act of 1909, especially of those that have to do with the production of patented articles; although it may be foretold from the beginning that the manufacture will be profitable only for a limited time, at the end of which the capital value of the plant must be subject to material depletion, the annual gains of such corporations are certainly to be taken as income for the purpose of measuring the amount of the tax."

It is contended that this case is inapplicable, because the facts disclose that the ores were being mined by a corporation upon its own premises. In our view, this makes no difference in the application of the principles upon which the case was decided. We think that the payments made by the lessees to the corporations now before the court were not in substance the proceeds of an outright sale of a mining property, but, in view of the

terms of these instruments, were in fact rents or royalties to be paid upon entering into the premises and discovering, developing and removing the mineral resources thereof, and as such must be held now as then, to come fairly within the term income as intended to be reached and taxed under the terms of the Corporation Tax Act.

In *Stanton* v. *Baltic Mining Company, supra,* the Income Tax Law of 1913 was before the court, and it was contended that the clause in that act, limiting the mines to a maximum depreciation allowance of five per cent. of their annual gross receipts or output of ore deposits, was unconstitutional, or, if that provision was inseparable from the rest of the act, the entire Income Tax Law, as applied to mining companies, was unconstitutional. Replying to the argument advanced by the mining company in that case, this court said that it rested upon the wholly fallacious assumption that, looked at from the point of view of substance, a tax on the product of a mine was necessarily a tax upon the property because of its ownership unless adequate allowance be made for the exhaustion of the ore body resulting from the working of the mine; and, further,

"We say wholly fallacious assumption because independently of the effect of the operation of the Sixteenth Amendment it was settled in *Stratton's Independence* v. *Howbert,* 231 U. S. 399, that such a tax is not a tax upon property as such because of its ownership, but a true excise levied on the results of the business of carrying on mining operations."

We think it results from the principles announced in these decisions that in such cases as are now under consideration, the corporation being within the meaning of the act organized for profit and doing business, it is subject to the tax upon its income derived from the royalties under these leases.

This brings us to the fourth and last question in the case, as to whether allowance should be made for deprecia-

tion on account of the depletion of the property by removing the ores from the mines in question.

The contention of respondents in this behalf is, that if the court shall find that the moneys received by them under their mining contracts can be deemed gross income, in whole or in part, they are entitled to deduct therefrom, as a reasonable allowance for depreciation, the full amount of the money so received, for the reason that they represent a mere transmutation of capital assets, being, in legal effect, the selling price of their rights in the mineral deposits on or before January 1, 1909, and which, by virtue of the mining contracts then outstanding, had been previously sold for the exact amounts of such receipts.

The statement of facts in the case of *Stratton's Independence, supra,* as the court states on pages 418 and 419, developed from the certificate, was:

"From that certificate it appears that the case was submitted to the trial court and a verdict directed upon an agreed statement of facts, and in that statement the gross proceeds of the sale of the ores during the year were diminished by the moneys expended in extracting, mining, and marketing the ores, and the precise difference was taken to be the value of the ores when in place in the mine. . . .

"It is clear that a definition of the 'value of the ore in place' has been intentionally adopted that excludes all allowance of profit upon the process of mining, and attributes the entire profit upon the mining operations to the mine itself. In short, the parties propose to estimate the depreciation of the mining property attributable to the extraction of ores according to principles that would be applicable if the ores had been removed by a trespasser."

It is true that in the case of *Stratton's Independence, supra,* the decision upon the question of depreciation was predicated upon the facts stated in the certificate presented to the court, and it was said, at page 422:

"It would therefore be improper for us at this time to enter into the question whether the clause, 'a reasonable allowance for depreciation of property, if any,' calls for an allowance on that account in making up the tax, where no depreciation is charged in practical bookkeeping; or the question whether depreciation, when allowable, may properly be based upon the depletion of the ore supply estimated otherwise than in the mode shown by the agreed statement of facts herein; for to do this would be to attribute a different meaning to the term 'value of the ore in place' than the parties have put upon it, and to instruct the Circuit Court of Appeals respecting a question about which instruction has not been requested, and concerning which it does not appear that any issue is depending before that court."

It therefore follows that we have the question of depreciation in this case presented under somewhat different circumstances than were outlined in the opinion in the case of *Stratton's Independence*.

The statute permits deduction of "all losses actually sustained within the year . . . including a reasonable allowance for depreciation of property." What was here meant by "depreciation of property"? We think Congress used the expression in its ordinary and usual sense as understood by business men. It is common knowledge that business concerns usually keep a depreciation account, in which is charged off the annual losses for wear and tear, and obsolescence of structures, machinery and personalty in use in the business. We do not think Congress intended to cover the necessary depreciation of a mine by exhaustion of the ores in determining the income to be assessed under the statute by including such exhaustion within the allowance made for depreciation. It would be a strained use of the term depreciation to say that, where ore is taken from a mine in the operation of the property, depreciation, as generally understood in

business circles, follows. True, the value of the mine is lessened from the partial exhaustion of the property, and, owing to its peculiar character, cannot be replaced. But in no accurate sense can such exhaustion of the body of the ore be deemed depreciation. It is equally true that there seems to be a hardship in taxing such receipts as income, without some deduction arising from the fact that the mining property is being continually reduced by the removal of the minerals. But such consideration will not justify this court in attributing to depreciation a sense which we do not believe Congress intended to give to it in the Act of 1909.

It may be admitted that a fair argument arises from equitable considerations that, owing to the nature of mining property, an allowance in assessing taxes upon income should be made for the removal of the ore deposits from time to time. Congress recognized this fact in passing the Income Tax section of the Tariff Act of 1913, § II, 38 Stat. 166, 167, when it permitted "a reasonable allowance for the exhaustion, wear and tear of property arising out of its use or employment in the business, not to exceed, in the case of mines, 5 per centum of the gross value at the mine of the output for the year for which the computation is made;" and in the Income Tax Law of September 8, 1916, 39 Stat. 756, 769, a reasonable allowance is made in the cases of mines for depletion thereof, "not to exceed the market value in the mine of the product thereof which has been mined and sold during the year for which the return and computation are made." These provisions were not in the Act of 1909, and, as we have said, we think that Congress, in that act, used the term "depreciation" in its ordinary and usual significance. We therefore reach the conclusion that no allowance can be made of the character contended for as an item of depreciation.

No contention is made in the brief for an allowance because of sales of stumpage, lots and lands belonging to

the companies, as an exhaustion of the capital assets, and evidently the case was brought for the purpose of testing the right of the companies to deduct the royalties agreed to be paid to them upon the removal of the minerals from the lands from the sums for which they were severally assessed.

For the reasons stated, we think the Circuit Court of Appeals and the District Court erred in the judgments rendered, and the same will be reversed and the cases remanded to the District Court for further proceedings, if any are sought, upon claim of right to deduct the value of the lands, lots and stumpage sold from the assessments made.

*Judgments reversed.*

Mr. Justice McReynolds took no part in the consideration and decision of these cases.