BANKERS POCAHONTAS COAL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

D. J. F. STROTHER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 10472, 14516, 14517, 25275, 32170, 42664.
Promulgated January 22, 1930.

*Camden R. McAtee, Esq.*, and *Wells Goodykoontz, Esq.*, for the petitioners.

*M. E. McDowell, Esq.*, and *Frank B. Schlosser, Esq.*, for the respondent.

902

906

OPINION.

SMITH: In these proceedings the Bankers Pocahontas Coal Co. contends that it received no income during the taxable years and all of the moneys received as royalties were in part payment of coal in place which had been sold prior to March 1, 1913; that the typical contract quoted in part in the findings of fact constituted a sale of coal in place made before March 1, 1913, under the laws of West Virginia, and that on March 1, 1913, the petitioner held only a chose in action from which no taxable income was subsequently received; that leasing agreements similar to those involved in these proceedings have been held by the courts of Pennsylvania in *Delaware & Hudson Canal Co.* v. *Hughes*, 183 Pa. 66; 3S L. R. A. 826; *Lehigh & Wilkesbarre Coal Co.* v. *Wright*, 177 Pa. 387; 35 Atl. 919; *Denniston* v. *Haddock*, 200 Pa. 426; 50 Atl. 197; and by the courts of West Virginia in *Wallace* v. *Elm Grove Coal Co.*, 58 W. Va. 449; 52 S. E. 485; *National Coal Co.* v. *Overholt* (W. Va.), 94 S. E. 735; to constitute sales of coal in place; that the Board is bound to give the same effect to such leasing agreements as has been given to them by the courts of the States of Pennsylvania and West Virginia.

This is the same contention as has been made before the Board in many different cases. Beginning with the case of *Nelson Land & Oil Co.*, 3 B. T. A. 315, and following down through a number of decisions, this Board has uniformly held that sums received as bonus or royalties from leases of oil and mineral rights were not income from the sale or exchange of capital assets, but constituted a part of the gross income that the petitioner was obligated to return as a part of its gross income. It is likewise the same contention which was made before the District Court of the United States for the Southern District of West Virginia in the case of *Bankers Pocahontas Coal Co.* v. *Albert B. White*, referred to in our findings, which was a suit for the recovery of additional taxes paid for the years 1914 to 1919. The learned judge of that court disposed of that case in the following language:

This brings on the first contention of the plaintiff, that is, that the plaintiff, by the reserved rentals and royalties, is being paid for the land and the coal thereunder, and that such rentals and royalties are not "income" but "purchase money."

Personally, I believe this statement to be true, but I cannot, in the face of all the decisions, sustain it here.

I therefore hold, that the royalty payments are income, and should pay a tax as such.

Judicial decisions upon the point are many. See *Hirschi* v. *United States*, 67 Ct. Cls. 637; *Berg* v. *Commissioner*, 33 Fed. (2d) 641; certiorari denied, 280 U. S. 76A; *Stanton* v. *Baltic Mining Co.*, 240 U. S. 103; *Von Baumbach* v. *Sargent Land Co.*, 242 U. S. 503; *United States* v. *Biwabik Mining Co.*, 247 U. S. 116. In *Hirschi* v. *United States*, *supra*, the court stated:

The one question involved is whether the income received by the plaintiff from said lease is taxable as income from the sale of capital assets or his ordinary income. If it is from the sale of capital assets the plaintiff is entitled to a refund; if it is not, he is not so entitled. Since the decision in *Stratton's Independence* v. *Howbert*, 231 U. S. 399, following through *Stanton* v. *Baltic Mining Co.*, 240 U. S. 103; *Von Baumbach* v. *Sargent Land Co.*, 242 U. S. 503; *United States* v. *Biwabik Mining Co.*, 247 U. S. 116, it has been consistently held that the trustees received from such leases of oil and mineral lands were to be treated as gross income. The principle is too well established to require extended discussion.

\* \* \* \* \* \* \*

The Federal Government is not limited in its selection of subjects for taxation by the construction of the State courts as to the property rights of individuals, provided the subject taxed was primarily a proper subject for taxation. Congress in passing a revenue act does not, and is not called upon to suit the revenue system of the country to the varying and conflicting decisions and laws of the different States. A revenue act is an act of Congress passed in the exercise of its constitutional right, and therefore the supreme law of the land, and where the constitutional powers of the Federal Government and the States conflict those of the States must give way.

Petition for writ of certiorari was denied by the Supreme Court in this case on October 21, 1929.

In *Van Devender*, 8 B. T. A. 697, contracts in West Virginia made by the petitioner and others for the mining of coal were held to constitute leasing agreements upon the authority of *Henry L. Berg et al.*, 6 B. T. A. 1287, and *Rosenberger* v. *McCaughn*, 20 Fed. (2d) 139. Counsel for the petitioners suggest, however, that in the *Van Devender* case the petitioner made the contracts and that they were not transferred to third parties; that the instant proceedings present the case of such transfer and that if there is any income received from the contract subject to tax it is ascertained by the exclusion of all capital from same, according to the final decision of *Rosenberger* v. *McCaughn*, 25 Fed. (2d) 699. We see no justification for the distinction sought to be made. The Bankers Pocahontas Coal Co. received its property in July, 1912, subject to certain leases upon the property. In our opinion the corporation simply stands in the shoes of the original lessors. The royalties received by it constitute part of its gross income. From such income it is entitled to deduct

a reasonable amount for the depletion of its property during the taxable years.

In computing the deficiencies for the years 1920 to 1926, the respondent has used a depletion rate of 3.6 cents per ton of ore mined each year. The respondent held that this was a reasonable depletion rate and that such rate multiplied by the tons mined each year constituted a reasonable deduction for depletion. The corporation taxpayer contends that this is not a proper rate and that its application does not permit the deduction of a reasonable amount for depletion. In support of its contention it submits the decision of the District Court made in the above cited case of *Bankers Pocahontas Coal Co.* v. *Albert B. White,* in which the court found that a reasonable depletion rate was 5 cents per ton multiplied by the number of tons of ore mined during each taxable year. The evidence before the District Court was introduced before the Board and in addition much additional evidence showing the cost of the properties to the Bankers Pocahontas Coal Co. at the time they were acquired in 1912, and likewise the agreed estimated tonnages in each of the leases upon the land. With respect to the cost of the properties to the petitioner corporation, D. J. F. Strother, the president of the corporation, testified as follows:

My recollection is that a bond issue outstanding on the property at that time was either two hundred and forty, or two hundred and sixty thousand dollars; I know I am right in either one amount or the other; we paid out sixty thousand dollars in cash; there were some troubles with the title and we paid on that, at one time, considering this stock at par, $35,000, and we withheld to straighten these titles out, to the Standard Pocahontas Coal Company, 600 acres of coal, which we valued anywhere from $50,000 to $150,000; we settled two or three other claims, and I do not think I am quite now qualified to speak about, of, I think I have them in my file there, some two thousand dollars more.

This would indicate a cost to the petitioner corporation of from $407,000 to $507,000. The evidence as to the March 1, 1913, value of the property is vague. In 1915 an engineer representing the Old Dominion Trust Co. of Richmond, Va., made a report on the company's property in which he stated that there were approximately 20,000,000 tons of mineable coal at an average value of 5 cents per net ton, making a total value of $1,000,000. On or about December 31, 1917, an account was entered upon the corporation's general ledger debiting coal lands $1,000,000, with the following explanation:

Estimated value as of March 1, 1913 of 6,000 acres coal land said to contain 20,000 tons of coal at five cents per ton.

The income-tax returns filed for those years claimed a March 1, 1913, value for the property of $1,000,000.

In *United States* v. *Ludey*, 274 U. S. 295, it was stated:

\* \* \* The amount of the allowance for depreciation is the sum which should be set aside for the taxable year, in order that, at the end of the useful life of the plant in the business, the aggregate of the sums set aside will (with the salvage value) suffice to provide an amount equal to the original cost. \* \* \*

\* \* \* \* \* \* \*

The depletion charge permitted as a deduction from the gross income in determining the taxable income of mines for any year represents the reduction in the mineral contents of the reserves from which the product is taken.

No essential difference is recognized in the decisions of the courts between depreciation and depletion, so far as the nature of the deduction under the taxing acts involved is concerned. Both are designed to return to the taxpayer the cost or March 1, 1913, value of property depreciated or depleted, whichever is the basis for the computation.

The evidence in the instant proceedings is that there was an estimated quantity of coal in place on March 1, 1913, of 37,608,642 tons. No contention is made anywhere that the March 1, 1913, value of this coal in place was in excess of $1,000,000. The depletion unit used by the respondent in his computation of 3.6 cents per ton will, upon the exhaustion of the coal deposits, return to the petitioner corporation a total of $1,353,911.11. The depletion rate used by the respondent will therefore return to the petitioner corporation an amount in excess of the greatest claim made by it as to the value of the coal in place at March 1, 1913.

The respondent has determined that a depletion rate of 3.6 cents per ton is a reasonable rate. The Commissioner's determination of tax liability is *prima facie* correct. *United States* v. *Rindskopf*, 105 U. S. 418; *Avery* v. *Commissioner*, 22 Fed. (2d) 6; *Brown* v. *Commissioner*, 22 Fed. (2d) 797; *Blair* v. *Roth*, 22 Fed. (2d) 932. If the corporation is entitled to a higher rate of depletion than that determined by the respondent, the burden is upon the corporation to prove the inadequacy of the depletion rate used by the respondent. We are of the opinion that it has not sustained that burden of proof.

In Docket No. 14517 the Bankers Pocahontas Coal Co. claims that its income for 1920 was overstated by the inclusion therein of royalties in the amount of $5,434.66 and taxes in the amount of $180, which were taxable as income of the year 1919, for which year the amounts were returned as income. The evidence indicates that the books of account show these receipts in 1920. It is contended, however, that the amounts were actually received by the corporation in 1919 and that it was through negligence that the amounts were not deposited in the bank until 1920. The evidence supports such claim. The contentions of the corporation upon this point are therefore sustained.

In Docket No. 42664 it is contended that the receipt in 1924 of $3,770.40 from the Flanagan Coal Co. did not constitute a receipt of income. This amount was received in compromise of a suit brought against that company by the petitioner " to recover the value of the coal that had been extracted, plus damages to the plant." At the hearing of these proceedings petitioner's president was asked to relate " the facts briefly out of which the condition arose which resulted in the receipt of that amount of money [$3,770.40] in 1924 by your company." Petitioner's president testified:

The Flanagan Coal Company owned an adjoining piece of land to our land; we discovered that they had mined across our boundary line in a particular seam of coal; I took that up with them and they first said they would pay for it. The matter hung on for some months; this was in 1920 when they had gone in there, at which time the price of coal was very high,—anywhere from $6.00 to $15.00 a ton. They did not pay, and when I got my engineers to go down to undertake to measure up how much coal they had gotten out, they found out they had shot in the entries and we could not get in at all, so I brought a suit for damages to the property, and we eventually settled it and we got this $3,770 in 1924, for damage to our property, and that seam of coal I figured and figured over with my engineers as at least $10,000 because they had absolutely destroyed the method of going in on that side of the hill.

He further testified on cross-examination:

We claimed our damages very considerably in excess of that [$3,770.40], but the Flanagan Coal Co. at that time was in a pretty precarious condition financially, and we figured every little bit would help, and we got as much as we could.

The respondent determined that the $3,770.40 in question was a part of the petitioner's gross income; that the trespasser had mined 15,000 tons of coal from the corporation's land; and that the petitioner was entitled to deduct from gross income, in its tax return for 1924, $540 for depletion in respect of the coal removed.

The taxing acts permit the deduction from gross income of losses sustained during the taxable year when not compensated for by insurance or otherwise. (Section 234(a)(4), Revenue Acts of 1918 and 1921.) If there was a loss sustained by the Bankers Pocahontas Coal Co. as a result of the tortious act of the Flanagan Coal Co., it was sustained in 1920, and the amount of the loss not compensated for by insurance or otherwise is deductible from the gross income of 1920. The evidence does not, however, afford facts from which the amount of the loss may be determined. We do not know what the cost of the coal removed by the trespasser was to the petitioner nor its March 1, 1913, value. If the Bankers Pocahontas Coal Co. is predicating the loss and damage to the property upon the inflated prices of coal in 1920, we think there is no justification for basing a deductible loss upon such inflated values. *Joseph E. Hubinger*, 13

B. T. A. 960, affirmed by the Circuit Court of Appeals for the Second Circuit December 2, 1929. The deduction of any loss for 1920 must therefore be disallowed for lack of proof of the amount of the loss, if any.

The same situation obtains with respect to the year 1924. The company received from the trespasser $3,770.40. The petitioner has found that all but $540 of this amount (which he has allowed as a deduction from gross income as depletion) constituted taxable income of the company for 1924. The company has submitted no evidence that the cost or March 1, 1913, value of the coal removed by the trespasser was in excess of $540 or that such basis plus damages to the property was in excess of $540. The determination of the Commissioner is therefore sustained for lack of evidence showing error on the part of the respondent. *Joseph E. Hubinger, supra.*

In Docket No. 14517, with respect to the year 1920, and in Docket No. 14516, with respect to the year 1921, additional error is alleged in the adjustment of surplus and, therefore, in the computation of the petitioner corporation's invested capital. The correctness of the adjustment depends upon the determination of a proper depletion allowance. It therefore follows that, when a proper depletion rate has been determined under the major issue of the proceedings, the establishment of a proper depletion reserve and the proper adjustment of surplus will necessarily follow and be made the subject of appropriate recomputation under the Rule 50 settlement.

With respect to the years 1920 and 1921, the corporation also claims that there has been an improper proration of dividends affecting its invested capital for those years. This raises the question of a tentative tax adjustment such as was involved in *L. S. Ayers & Co.,* 1 B. T. A. 1135. The rule of the Board in *L. S. Ayers & Co., supra,* should be applied in the recomputation of the deficiencies.

The only issues raised in the three proceedings taken by D. J. F. Strother relate to an overstatement of his income for the years in question, resulting from the inclusion therein of the dividends received by him from the corporation. The respondent submits that the determination of the nature of the receipt by the corporation under the leases will also determine the nature of the dividends paid out of its receipt to the stockholder. To the extent that the distribution made by the corporation constitutes a distribution of its depletion reserve the amount received by Strother is nontaxable. Parties are in full accord as to the treatment to be given the individual appeals.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*