## SAN FERNANDO MISSION LAND CO. v. COMMISSIONER OF INTERNAL REVENUE.

No. 10272.

Circuit Court of Appeals, Ninth Circuit.

April 27, 1943.

Harry Graham Balter, of Los Angeles, Cal., for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Helen R. Carloss, S. Dee Hanson, and A. J. Rockwell, Sp. Assts. to Atty. Gen., for respondent.

Before DENMAN, · MATHEWS, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

The petitioner asks us upon review to reverse the decision of the Board of Tax Appeals (now United States Tax Court) to the effect that there was a deficiency in excess profits tax liability of petitioner for the taxable year of 1938 in the sum of $8,035.64. There is no factual issue present, and this petition must be granted if petitioner was not "carrying on or doing business" during any part of the capital stock tax year ending June 30, 1938, within the meaning of § 601(a) of the Revenue Act of 1938, 26 U.S.C.A. Int.Rev.Acts, page 1139. "For each year ending June 30, beginning with the year ending June 30, 1938, there is hereby imposed upon every domestic corporation with respect to carrying on or doing business for any part of such year an excise tax of $1 for each $1,000 of· the adjusted declared value of its capital stock."

The following, mainly taken from respondent's brief, is a fair recitation of the facts:

Taxpayer is a California corporation with principal office at Los Angeles, California, and filed its 1938 income tax return with the Collector there. It was organized in 1904 to buy, develop, and sell land; it acquired over 16,000 acres about fifteen miles from the center of Los Angeles, and engaged actively and successfully in the development and sale of this tract. In 1918 it declared a dividend of $1,000,000 which it paid by a distribution of lands among its shareholders. Thereafter it donated some land to the city for parks, restricted its business activity, reduced its capitalization from $1,000,000 to $100,000, and distributed $1,250,000 in a series of dividends, the last being one of $100,000 paid on January 29, 1923. Few assets remained, and shareholders displayed little interest in the corporation, but it was not dissolved. After a meeting on February 2, 1927, the directors did not again meet for nearly a decade. On state franchise tax returns, taxpayer was described as "practically liquidated."

Taxpayer's remaining properties after 1930 consisted of a thirty-five acre grove of orange and lemon trees, 138 acres of unplotted hill lands, reservations of mineral rights in some 3,000 acres of land previously sold, and a very small amount of cash. The grove was in poor condition, unprofitably operated for many years, and in 1937 the trees were uprooted and it was abandoned to the state for unpaid taxes. The hill lands lying some twenty miles from the center of Los Angeles were without improvements or available water. Of the original acreage, they constituted a part for which no buyer was found. (As described by petitioner in his opening brief, these unsold lands were "tail-end" pieces.) The grove and these lands were carried on taxpayer's books at $52,500 and $13,800, respectively. The reservations of mineral rights were carried at one dollar. In selling its real estate, taxpayer had in some cases reserved mineral rights and as in early years had authorized its officers to execute oil and gas leases. The board of directors in 1925 gave consideration to proposals for oil leases, and at the meeting on February 2, 1927, they considered several proposals and ratified a release of the reserved rights in certain land for a consideration of $2,940. At the same time they resolved to make no more such releases "for the present, at least."

After 1930, taxpayer operated the grove at a continual loss; in 1932 it made one sale of realty for about $1,500; in 1935 it rented pasture for $75, and in 1936 it received $7,500 for release of oil reservations and for a lot. Taxes and expenses exceeded income except in 1936, and the balance sheet constantly showed a deficit of about $40,000 during the period. In 1936 no oil had been found on or near taxpayer's properties and no survey for oil had been made. At the instigation of the president of one of taxpayer's creditors, the directors met on September 14, 1936, and elected him president. He entered into negotiations for the leasing of oil rights. A lease, authorized by the directors and placed in escrow on November 10, 1937, was not delivered because of the lessee's failure to perform conditions. On his initiative, the grove was abandoned in the fall of 1937.

During the fiscal year July 1, 1937—June 30, 1938, taxpayer received $51.87 in the sale of fruit; $50 from the rental of pasture; and two other small items. From

the sale of 4.75 acres of the hill lands it realized a profit of $1,890 and in the sale of reserved oil rights it received $1,180. Its total income was $3,270.66, and its expenses and taxes were $2,897.34. On March 16, 1938, taxpayer made a twenty-year lease of oil rights for royalties which are being paid. On August 26, 1938, it made a lease of oil rights for $20,000 and royalties from oil as long as produced.

Taxpayer received income from its leases in 1938, 1939 and 1940, and declared dividends in each of those years.

On August 26, 1938, taxpayer employed Robert V. New to promote and negotiate oil leases. His compensation was to be based on the amount of rental. Through New's efforts, taxpayer made a lease of oil rights on November 25, 1938, for a minimum period of twenty years, receiving $76,130 and the right to a royalty. Pursuant to the employment agreement, taxpayer paid New $33,306.88 for negotiating this lease and paid an attorney $250 for preparing the instrument.

Thus it will be seen that taxpayer succeeded in selling for profit most of its lands (its main purpose and business) during the first few years of its existence and remained comparatively, in fact almost completely, inactive for several years. However, it was not dissolved, and when the opportunity came, as it did in one instance, it made a sale of a substantial portion of its remaining land holdings at a profit. When the prospect brightened for the development of oil upon its properties and through reserved oil rights, petitioner's attention to the profit motive became active. This oil prospect revival prevailed within the tax paying period here involved, and taxpayer took advantage of it.

■ The proper application of the phrase "carrying on or doing business" as it is used in tax statutes was fully considered in Flint v. Stone Tracy Co., 220 U.S. 107, 31 S.Ct. 342, 357, 55 L.Ed. 389, Ann. Cas.1912B, 1312, and therein the Supreme Court approved the statement found in other judicial opinions that the word "business" as it is used in the phrase under examination includes "that which occupies the time, attention, and labor of men for the purpose of a livelihood or profit." In Von Baumbach v. Sargent Land Co., 242 U.S. 503 at pages 514, 37 S.Ct. 201 at page 204, 61 L.Ed. 460, et seq., the Supreme Court again approved this statement, pro-

ceeded to trace the Supreme Court's course in the matter down to the time of decision in the cited case, and concluded that "The fair test to be derived from a consideration of all of them [referring to the cited cases] is between a corporation which has reduced its activities to the owning and holding of property and the distribution of its avails, and doing only the acts necessary to continue that status, and one which is still active and is maintaining its organization for the purpose of continued efforts in the pursuit of profit and gain, and such activities as are essential to those purposes."

Thus the rule is clear, but as is indicated in the judicial history of the subject, there appears sometimes a twilight zone of fact wherein the objective does not appear in definite outline. With this in mind the Second Circuit in Argonaut Consol. Mining Co. v. Anderson, 52 F.2d 55, 56, said, "That there is a degree of quietude which will exempt" a corporation from paying the tax "is indeed well settled." It is then stated in the opinion that in most of the cases therein cited wherein the corporation has not been required to pay the tax the corporation's activities "have been confined to holding the title of property, whose usufruct it receives and distributes in dividends."

This court has adhered to these guiding principles in Porter v. Commissioner, 9 Cir., 130 F.2d 276, Commissioner v. Boeing, 9 Cir., 106 F.2d 305, and United States v. Metcalf, 9 Cir., 131 F.2d 677.

■ The facts of the instant case conclusively support the Board's holding that the petitioner was carrying on and was doing business in the period for which the tax was levied when measured by either the affirmative rule pronounced in the Von Baumbach case, supra, or by the negative rule pronounced in the Argonaut case, supra, or by both of these rules.

If more were needed the treasury administrative regulations set out and applied in Magruder v. Washington, B. & A. Realty Corp., 316 U.S. 69, 62 S.Ct. 922, 86 L.Ed. 1278, would be important. But we find no *twilight zone,* no *uncertain degree of quietude,* no *nuances of facts* for the tax period with which we are here concerned and therefore find no occasion for calling these regulations to the aid of the judicial process.

Affirmed.