DOYLE, Internal Revenue Collector, v. MITCHELL BROS. CO.

(Circuit Court of Appeals, Sixth Circuit. June 30, 1916.)

No. 2864.

1. INTERNAL REVENUE ⬦9—EXCISE TAX ON CORPORATIONS—INCOME.

A corporation engaged in manufacturing lumber, whose property consisted chiefly of timber lands and a sawmill, purchased long prior to the enactment of Corporation Tax Law (Act Aug. 5, 1909, c. 6, § 38, 36 Stat. 112 [Comp. St. 1913, §§ 6300–6307]) timber lands which at the time the law went into effect had greatly increased in value. Preparatory to making the income return for 1909, the company revalued its land as of December 31, 1908, but failed to enter on the books the real value, though the land had previously been carried at the original valuation. *Held*, that as the net income or income received must, in view of the deductions necessarily allowed, be treated as the appreciation or gain resulting from the carrying on of business, or natural increase, the corporation was entitled to deduct from the value of timber cut from such land the actual value of the land, notwithstanding its previous undervaluation; this being particularly true in view of the rulings of the Treasury Department as to income.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. ⬦9.]

2. INTERNAL REVENUE ⬦9—EXCISE TAX ON CORPORATIONS—VALUATION OF PROPERTY.

In such case, neither the government nor the corporation is bound by the valuation fixed in the corporation's books, for, had the owner been an individual and kept no books, such deduction must have been made.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. ⬦9.]

In Error to the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

Action by the Mitchell Bros. Company against Emanuel J. Doyle as Collector of Internal Revenue for the Fourth District of Michigan. There was a judgment for plaintiff (225 Fed. 437), and defendant brings error. Affirmed.

Myron H. Walker, U. S. Atty., of Grand Rapids, Mich., for plaintiff in error.

Mark Norris and Oscar E. Waer, both of Grand Rapids, Mich., for defendant in error.

Before KNAPPEN and DENISON, Circuit Judges, and EVANS, District Judge.

DENISON, Circuit Judge. Mitchell Bros. Company, a Michigan corporation, acting pursuant to the Corporation Tax Law of 1909 (36 Stat. 112, c. 6, § 38 [Comp. St. 1913, §§ 6300–6307]), made an income return and paid the tax due thereunder. Later the Commissioner of Internal Revenue, after an investigation, raised the figures of income return and assessed an additional tax. The company paid under protest, and this action was brought in the court below to recover the amount so paid. The case was tried without a jury, and the District Judge made special findings of fact and of law, and rendered judgment for plaintiff. The collector alleges error.

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Several items are involved, but all depend upon the same principles, and we state one only—and, for simplicity, in figures of acreage, instead of per thousand feet of lumber. The plaintiff corporation was organized in 1903. Its capital stock was represented mainly by timber lands entered on the books at their purchase price. This standing timber—or stumpage—then had a market value of $20 per acre, and it was taken in as capital at this figure. Owing to the market increase in stumpage prices, and to new methods of using much stumpage formerly wasted, the market price of such standing timber had become, on December 31, 1908, $40 per acre. No entry was ever made on the books representing this increase in value, but each year the company entered on its books, as a profit, the difference between the original cost, $20, and the sums received for the manufactured product cut from an acre, less the cost of manufacture, and the profits so seeming to accrue were either paid out in dividends or carried into the surplus account. After the passage of this tax law, in August, 1909, and preparatory to making the income return for 1909, the company revalued this stumpage, as of December 31, 1908, and fixed that value at (about) $40 per acre. The good faith and accuracy of this valuation are not questioned. It was made upon the basis of price per thousand, but the figures so reached were never entered in the corporate books of the company and never affected the showing of profits made thereon. In making its return for 1909, and in stating net income, the company deducted, from the proceeds of lumber sold, this sum of $40; but the Commissioner restored $20 of that amount, and held that the only deduction authorized by the law was the $20 which had been originally entered and which had been carried on the account books as the cost of the stumpage. The decisive question here is whether the $20 difference—the additional value of the timber which had accrued before 1909, but had not been entered on the books—was taxable income for 1909. The amount of the tax so in dispute for the four years, 1909–1912, is $2,732, with interest at 5 per cent. from December 22, 1913, the date when payment under protest was made.

[1] The collector insists that the net income taxable under this law is a different thing from profits, and complains that the District Judge overlooked the distinction. The statute refers to "net income," but it expressly provides for deducting certain items from the gross income, and whether the residuum does or does not substantially differ from what are commonly called profits is an academic question in this case. It makes no difference what name is given to the net sum which thus becomes taxable. The collector also urges that the "income received," named in the statute, must be defined with specific reference to the word "received."

It is clear that, by the term "income," Congress did not intend to include the proceeds of capital assets sold or converted during the year; nor can it be material whether such proceeds are reinvested in other property or remain in the treasury of the company or are distributed to the stockholders; nor whether, in case of such distribution, they are called dividends or capital. The controlling question must be whether assets so converted were in fact, at the beginning of the tax

period, properly to be classed as capital assets. If they were of that character, they cannot be "income" received during the later period; they represent merely capital in a changed form.[1] If an illustration were needed to show that money received from selling capital assets cannot be "income," it would be found in the statutory treatment of insurance money. A loss suffered during the year may be deducted from income, but not so if the loss was compensated by insurance. Fire insurance money is clearly a substitute for the assets burned; but we find that in case of a fire loss uninsured the loss may be deducted from income, while if it is insured, and if the insurance money is "income," the loss may not be deducted, and the insurance money must be added—an absurdity which can be avoided only by saying that such insurance money is not income at all. The proceeds of the sale of a building or other permanent assets are as clearly a substitute therefor as is the insurance money paid to indemnify for a building burned.

Indeed, no one disputes the proposition, in its broadest aspect, that the selling price of capital assets is not "income"; the assessment made by the Commissioner of Internal Revenue, and here involved, goes upon the theory that it is right to deduct the proceeds of such assets from the receipts of the year before ascertaining net income; but the only controversy is as to the proper definition of those capital assets which are to be thus excluded.

It is equally clear—to us—that "income" is not limited to cash receipts. Of course, the word is capable of this restricted meaning, and any number of interesting problems can be evolved through nice refinements in the precise meaning of "income," "received," "depreciation," "actually paid," and other statutory words; but this law was passed to make a workable system of raising revenue, and not to provide exercise in dialectics. The theory which should undertake to consider only the cash received during the year for property sold, and then to ascertain the cost of each item so sold, no matter whether produced during the year or long before, would, in the ordinary, typical manufacturing or merchandising business, be impossible of intelligent application. "Income received" need not be in cash. If, in the regular course of business, the property has been sold and is represented by a bill or account receivable, it is no undue stretch of language to say that these proceeds are income received. It is only a step further in the same line to say that property, regularly on hand for sale at the end of the year and which has an ascertainable market value, realizable at the owner's option, has been "received" by the busi-

[1] Treasury Decision No. 1606, March 29, 1910, § 76: "Removal of timber from timber lands, while depleting the lands to the extent of such removal, is regarded as a change in the form of assets, and not a depreciation, within the meaning of the act."

Treasury Decision No. 1675, February 14, 1911, § 75: "The mere removal of timber by cutting from timber lands, unless the timber is otherwise disposed of through sales or plant operations, is considered simply a change in form of assets. If said timber is disposed of through sales or otherwise, it is to be accounted for in accordance with regulations governing disposition of capital and other assets."

ness and should enter into a computation of income. Otherwise, a business which had been very profitable, but in which the bulk of the annual output was being held at the close of the year for a further market rise, would have no income at all. Indeed, in the present case, that part of the computation upon which the taxpayer and the Commissioner and the collector's counsel all unite, for ascertaining income, includes, as a part of the income for 1909, more than $300,000 for lumber in the yard unsold at the end of the year, and the elimination of this item would wipe out all net income several times over.

Doubtless there may be difficulties in making the proper appraisal of property on hand. Perhaps it should be listed at market price less cost of sale, or perhaps at cost of production, because the element of gain or loss reached by comparison with market selling price may be too contingent to justify a permanent taking over into the accounts; but these are practical questions, and they can be met in a practical way. Those business enterprises which the law affects have well-known methods and customs for meeting these problems, and have no difficulty in finding the gains or profits or income—or whatever they may be called—which have been received, and stating them surely enough and definitely enough to form an acceptable basis for the declaration and payment of dividends in a corporation, or for affecting and fixing the selling price of corporate stock or of any and every going business enterprise; and the use of the same methods, in good faith, will easily determine the taxable "net income" of such an enterprise as this.

If property on hand at the end of the year, figured at its true inventory or market value, must be put upon one side of the income account, there can be no escape from putting the corresponding true value at the beginning of the year upon the other side of the account; and this must include the raw materials which were on hand at the beginning. The law contemplates distinct periods. Everything before 1909 must be in one period; everything later in another; and then, for taxing purposes, each calendar year after that date forms a distinct subperiod; the law plainly contemplates that all income shall be definitely located somewhere. The law applied to and took effect upon business conducted after January 1, 1909; business is conducted with property; and so the law took effect upon the body of property existing at that date and upon the business thereafter conducted by and with the aid of that body of property. In the later successive years, and as to some classes of property, it may serve every purpose to delay the computation or entry of income or gains seemingly existing in one year until cash realization in the next, and to do this by carrying an arbitrary, but constant, inventory value; this will make no difference to taxpayer or to the government in the end; but not so with reference to the two main periods before and after the law took effect. In the sense in which we have seen "income" is and must be used at the end of each taxing year, it must be used at the end of the period preceding 1909. Whatever would be income for 1909, if it accrued after January 1st, had become income on that day if it had accrued in the earlier period.

235 F.—44

The practical necessity of including a comparison between beginning and ending period priced inventories, as an element in computing net income is further illustrated by the provision as to "depreciation." This may be deducted; a drop in market prices provides the commonest instance of loss by depreciation; but unless there is a beginning appraisal, there is nothing from which to compute the loss. So, too, if a loss by depreciation is to be deducted, a gain by appreciation must be added; otherwise, the taxpayer would get permanent credit for a loss which might be temporary. A fall in market price in December, followed by an equivalent rise in January, ought not to diminish the taxable income for the two years; but it would do so if property on hand is to be considered at all, and if the loss the first year is deducted, and the later gain not added.

The true character of that particular accumulation on January 1, 1909, now involved, may be illustrated with reference to this corporation. To meet this $20 per acre increase in market value, the company could lawfully have paid out a cash dividend or a stock dividend, or it could have sold its property for the original value plus the appreciation and have distributed the entire proceeds. If this had been done on December 31, 1908, there would be no income in 1909. If the consummation were postponed for two days, upon no tenable theory could it be thought that the $20 appreciation would become part of the income produced by carrying on the business during 1909. We are satisfied that the necessary and practical working of the law requires, and that its words fairly permit, income for one year to be computed by the aid of a comparison between the market value of the body of property on hand at the beginning and at the end of the year; and it follows that such a market value of property existing at the commencement of the period must be deducted from the selling price afterwards received. We are speaking only of those business assets the manufacture and sale or the purchase and sale of which constitute the regular business which is being measured for taxation purposes—assets which were acquired and held for sale and are intended to be sold as soon as put in the selected selling form. Appreciation in assets intended for more permanent holding may or may not be governed by the same considerations.

Counsel for the collector takes something from the fact that income is not here taxed as such, but is used only as a convenient measure of determining the amount of business done, upon the doing of which business the excise tax is imposed. This is not controlling; it leads as well to the other conclusion. In such a business enterprise as this, the manufacturing of the raw material and putting it into ultimate salable form is much the greater fraction of the business done and receiving the protection of the laws; the final converting of the product into cash is much less; and "income" cannot be made the measure of this greater fraction, unless by the aid of comparing the body of property on hand at the beginning and at the end of the period. If the receipt of money for sales was the measure of income, and so of volume of business, the taxpayer could evade taxation by ceasing sales and accumulating stock as the law was repealed and the

end of the taxing period approached, or by abnormally ceasing manufacture and reducing stock in anticipation of the taking effect of the law.

There are three possible methods of treating such a business as this: (1) We may say that there is no income whatever, since the sale of capital assets determines their value in the raw material form and so nothing has been received except their fair price; (2) we may say that the entire selling price of the assets is income when the money is received; or (3) we may say that the appreciation therein and gain thereupon during the period and found at its end in realizable form is income. The first or second definitions conform rather better to the ordinary meaning of the word, but they cannot be accepted. The first was held, in Stratton's Independence v. Howbert, 231 U. S. 399, 34 Sup. Ct. 136, 58 L. Ed. 285, to be erroneous and to involve a misapplication of Gray v. Darlington, 82 U. S. (15 Wall.) 63, 21 L. Ed. 45. The second is in conflict with the unbroken practice of the Treasury Department in administering this law,[2] and in conflict with the assessment made by the Commissioner in this case; and we have pointed out some of the reasons why it cannot have been intended by Congress to be applicable to this kind of a business. The third is workable and practicable, and, as we think, the only fair interpretation.

Counsel for the collector rely upon a number of cases, mostly English,[3] to support the proposition that where the business which is being carried on contemplates and necessarily involves a wasting of the capital assets, the proceeds of that wasting are entirely income. Of those cases, it is to be noticed that they are mostly mining cases, and that mineral out of sight, in the ground, forms a peculiar class of

[2] Treasury Decision No. 1571, December 3, 1909, § 5: " * * * It is immaterial whether any item of gross income is evidenced by cash receipts during the year or in such other manner as to entitle it to proper entry on the books of the corporation from January 1 to December 31 for the year in which return is made. * * * If the capital assets were acquired prior to January 1, 1909, the amount of increment or depreciation representing the difference between the selling and buying price is to be adjusted so as to fairly determine the proportion of the loss or gain arising subsequent to January 1, 1909, and which proportion of the loss or gain arising subsequent to January shall be deducted from or added to the gross income for the year in which the sale was made."

Treasury Decision No. 1588, January 24, 1910, § 2: "In making up the gross income to be reported in item 3, the cost of the goods manufactured shall be ascertained by the addition of a charge to the account of the cost of the goods as manufactured during the year of the sum of the inventory at the beginning of the year, and a credit to the account of the sum of the inventory at the end of the year."

Treasury Decision No. 1742, December 5, 1911, § 62: "In the case of lands bought prior to January 1, 1909, and sold during any subsequent year, the profits arising from such sale, if no accounting of increased value of land was made in return for previous years, should be prorated in accordance with the number of years the land was held by the corporation and the number of years the law was in effect."

[3] Stevens v. Hudsons Bay Co., 101 L. T. 96; Lee v. Asphalt Co., 41 Ch. Div. 1; Coltness Co. v. Black, 6 App. Cas. 315; Kauri Timber Co. v. Commissioner, 1913 App. Cas. 771.

capital assets. It has no market value because it cannot be measured, and neither quantity nor quality can be definitely known; it is predominantly speculative, and the difficulty of determining what is capital and what is income is very great; while this standing timber had at all times an easily ascertainable market price. In so far as these cases hold that the entire capital so realized is necessarily income, they are in conflict with Stratton's Independence v. Howbert, supra, since the latter case expressly recognizes that a suitable allowance for depreciation or consumption of ore in the ground should be made and the Treasury Decisions 1606, 1675, 1742, 1754, 1755, and 1833 have provided practicable systems for computing such allowance. It is to be further noticed regarding these cases that they depend upon the exact words of the particular statutes, differing materially from the statute here involved, and that to these statutes the considerations above stated and which we have thought controlling may not and probably do not apply.[4]

[2] There is nothing magical in bookkeeping; it does not create facts; it only records them. A citizen cannot be rightly taxable in one way if he keeps books and in another way if he keeps none; nor in one way if his books are accurate and kept up to date, and in another way if they are imperfect and neglected. Book entries may be of value as an admission when a tax is to be assessed and when there is a dispute as to the fact, but they cannot work an estoppel as to an undisputed fact.[5] The insistence of the Commissioner that this $20 per acre appreciation is income for the year in which the timber happens to be cut rests at last upon the theory that the taxpayer is estopped to claim that it was income for an earlier period because he had not so entered it on his books; and this theory we cannot accept. Its formal transfer into surplus or undivided profits account would have done nobody any good or any harm. Until this law was passed, it was a matter of indifference to the corporation and to the stockholders whether profits were entered up at one time or another, and any attempt after August, 1909, to make a book entry of these gains, nunc pro tunc, as of December, 1908, would only have invited adverse comment.

On this subject, there cannot be one rule for a corporation and another for an individual. If this property had continued to be owned by the partnership which preceded the corporation, there might have been no capital account representing the land and timber. The existence or not of such an account would have been incidental to the bookkeeping system adopted. It is only the existence of the capital stock of the corporation which compels the maintenance of an account showing the corresponding assets. So, we find ourselves

---

[4] E. g., In Kauri Co. v. Commissioner, the statute said: "No deduction shall be made in respect of * * * expenditure of capital, loss of capital, capital withdrawn."

[5] See comments by Lacombe, C. J., in United States v. Nippissing Co. (D. C.) 202 Fed. 803, 804, and by Dickinson, D. J., in Baldwin v. McCoach (D. C.) 215 Fed. 967, 970.

unable to give any controlling force to the fortuitous circumstance that in this case the capital account was carried under the name of "Land and Timber," and that the accretions had not been entered.

We find no authority precisely in point. In Gray v. Darlington, supra, and in numerous cases which have followed that decision, including Gauley Co. v. Hays (C. C. A. 4) 230 Fed. 110, —— C. C. A. ——, the precise point involved was whether the entire profit made by a stockholder or bondholder in a corporation, upon a sale of his stock or bonds, as compared with the original purchase price, was income apportionable solely to the year of sale. It was held that this profit was not such income. These cases are not necessarily, if at all, inconsistent with some reasonable apportionment to the taxing period of that part of the profit which accrued during that period; and certainly, since the question now involved is not the income of the stockholder or bondholder on his investment, but the income of the corporation which issues the stock or bonds, these cases do not conflict at all with our conclusion that the body of property of such a corporation, at the beginning and at the end of the period, should be compared as one of the steps to ascertain that net income which is merely a measure of volume of business. The same thing is true of those decisions[6] which, as between life tenant and remainderman, classify a dividend when it is received by the stockholder as a part of his income rather than as part of the principal fund, even though it may include a capital distribution. In Baldwin v. McCoach (C. C. A. 3) 221 Fed. 59, 136 C. C. A. 660, we find a state of facts similar to that here involved in one respect. Capital assets which existed January 1, 1909, had never been entered on the books at all. They were appraised and so entered during the year 1909. It was held that they did not thereby become part of the income for that year. The reasoning of the District Judge, affirmed by the Circuit Court of Appeals, is to the effect that the matter of entering or not upon the corporate books is of no importance as against the truth. Whether an actual change in value of these assets, occurring during the year 1909, might rightfully have been taken into account, either as increase or decrease, was not involved.

The judgment of the court below is affirmed, but without costs.

[6] E. g., Oliver's Appeal, 136 Pa. 43, 20 Atl. 527, 9 L. R. A. 421, 20 Am. St. Rep. 894; Clark and Marshall, p. 1621.