BIWABIK MINING CO. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit.    May 8, 1917.)

No. 2938.

**1. INTERNAL REVENUE ⊚⟹9—CORPORATION EXCISE TAX—"INCOME."**
That Act Aug. 5, 1909, c. 6, § 38, 36 Stat. 112, does not impose a tax upon the income of corporations, but an excise tax measured by their income, cannot affect the meaning of the word "income," as used therein.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28.
For other definitions, see Words and Phrases, First and Second Series, "Income."]

**2. INTERNAL REVENUE ⊚⟹9—CORPORATE EXCISE TAX—TAXABLE INCOME.**
The receipts and accumulations of a business corporation, representing the sale or conversion of its capital, do not constitute taxable income, under Act Aug. 5, 1909.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28.]

**3. INTERNAL REVENUE ⊚⟹9—CORPORATE EXCISE TAX—TAXABLE INCOME.**
Where iron mines are located in a district where the mining is done by simple quarrying after the overlying surface has been stripped off, and the quantity of the ore in the ground can be measured with substantial accuracy, the selling price of ore mined and sold in any year, so far as it represents the actual value to the mining company of the ore in the ground on January 1, 1909, is not income, under Act Aug. 5, 1909, whether the value of the company's interest in the ore in the ground is based upon the amount paid therefor, or upon a subsequent appreciation of its market value before the taxing law went into effect.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28.]

**4. INTERNAL REVENUE ⊚⟹9—CORPORATE EXCISE TAX—TAXABLE INCOME.**
That the company was not the owner, but only a lessee, did not affect the application of this rule, where its interest could have been bought and sold, and was salable on January 1, 1909, for the amount adopted as representing the value of the ore in the ground, and where at the rate the ore was being mined it would all be removed before the expiration of the lease; the fact that the lease might be forfeited or given up not making income of what would otherwise be capital.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28.]

In Error to the District Court of the United States for the Eastern Division of the Northern District of Ohio; John H. Clarke, Judge.

Action by the United States against the Biwabik Mining Company. Judgment for the United States, and defendant brings error. Reversed, and petition dismissed, conditionally.

The Biwabik Company is an operating iron mining company. In 1910 the company made its return to the collector of internal revenue, for the year 1910, as required by the excise tax law of August 5, 1909 (36 Stat. p. 112, § 38), and paid the tax indicated by the return. In 1915 the United States brought this action, alleging that the return for the year 1910 wrongfully omitted from income the sum of $265,372, and asking a judgment for 1 per cent. of this amount. Judgment for the United States was rendered in the court below, and the company assigns error. The case was submitted to the District Judge without a jury, upon an agreed statement of facts, and presents only questions of law.

The company was lessee of the property, on which it was operating, under a mining lease, and under a method of business which has become familiar to us through many cases which have come to this court. In these contracts, the

lessee is privileged to remove ore upon the payment of a certain price per ton, called "royalty." The leases run for long periods of years (in this case 50 years), and they contain many provisions for regulating the rights of the parties. The royalty is usually fixed for the whole period at some standard rate per ton, and if the market conditions at the time indicate a higher value for the ore in the ground than the standard royalty, the lessee pays, at the time of taking the lease, a bonus in cash designed to meet so much of this advanced value as is thought to be sufficiently permanent. When the lessee sells to another operator his interest in the lease, the price is determined by fixing the bonus to be paid, and thereupon the purchaser steps in to the position of the first lessee.

In 1898 the owner of certain iron ore lands upon the Mesaba Range, in Minnesota, executed a mining lease of this character. The lessee's rights thereunder, after some mesne transfers, were duly purchased by the Biwabik Mining Company, in June, 1898, in consideration of $612,000 cash. This consideration also covered certain other personal property of the assignor. From 1898 to and including 1910, the Biwabik carried on the operation, paying to the lessor the prescribed royalty of 30 cents per ton.

It is also familiar that the iron ore deposits of the Mesaba Range are of a different character from those in (most) other iron mining districts. The ore is not found in veins, which incline more or less vertically, and which are of constantly changing thickness, shape, and quality, as is typically the case with the precious metals; nor does it lie, as coal does, in comparatively thin veins, approaching the horizontal. It lies in horizontal bodies, lenticular in form, comparatively near the surface, and the body of the ore, except at the edges of the deposit, is of a very considerable thickness. It is soft, and it is mined by stripping off and carrying away the overlying surface, and then excavating the ore with steam shovels. Such a so-called mine is, in truth, nothing more nor less than a quarry. The quality of the ore throughout such a deposit is substantially constant, and the quantity, by the use of diamond drills upon the surface and by simpler methods after it has been stripped, can be measured with substantial accuracy. This general situation has been applied to this case, by the stipulation of the parties as follows:

"(4) The iron ore body on said property lies in a flat or blanket formation from about 30 to 60 feet below the surface, and the ore is mined by steam shovels after the removal of the surface. The boundaries of said ore body and the depth, quantity, and quality of said ore is capable of determination with extraordinary accuracy by test pits, shafts, and drilling from the surface. Prior to the year 1909, there had been mined and removed from said premises 7,420,114 tons of iron ore, and in connection therewith, by drilling and by standard recognized methods, defendant had calculated the tonnage and the quality of the iron ore then still remaining upon the said premises, and had ascertained that said property contained 6,874,695 tons of merchantable iron ore, all of which was readily and easily minable and removable before the expiration of the date of said contracts, in the year 1948.

"(5) In the condition said premises were in on January 1, 1909, the contract of April 4, 1898, and the rights created thereby, exclusive of buildings and machinery on said premises, were of the actual value of $3,351,413.81, and the ore in said property, considering the entire deposit thereof en bloc, on January 1, 1909, was of the value of 48¾ cents per ton, exclusive of the royalty of 30 cents per ton provided for in the lease."

During the year 1910 the company mined and shipped, or otherwise disposed of, 544,353 tons of such ore at an average sale price of $3.10 per ton. Of this price, 30 cents represented the royalty, about $1.90 the operating and similar costs, 4 cents the original bonus paid to the assignor of the lease (plus interest and taxes), 44¾ cents the additional value which, according to the stipulation, the interest of the company was worth January 1, 1909, and about 40 cents the company's net profit over and above these items.

Shortly after the excise tax law was passed, the Commissioner of Internal Revenue, who was, by law, charged with that duty, promulgated regulations governing its collection. The presently material parts of such regulations, as first promulgated and as later modified, are as follows:

Regulation No. 31, Issued December 3, 1909.

### Article 2, Gross Income.

The following definitions and rules are given for determining the gross income of the various classes of corporations:

\*    \*    \*    \*    \*    \*    \*    \*

Sale of Capital Assets.—In ascertaining income derived from the sale of capital assets, if the assets were acquired subsequent to January 1, 1909, the difference between the selling price and the buying price shall constitute an item of gross income to be added to or subtracted from gross income according to whether the selling price was greater or less than the buying price. If the capital assets were acquired prior to January 1, 1909, the amount of income or depreciation representing the difference between the selling and buying price is to be adjusted so as to fairly determine the proportion of the loss or gain arising subsequent to January 1, 1909, and which proportion shall be deducted from or added to the gross income for the year in which the sale was made. But for the purpose of determining the selling price, as provided in this section, there shall be added to the price actually realized on sale any amount which has already been set aside and deducted from gross income by way of depreciation as defined in article 4 and has not been paid out in making good such depreciation on the property sold.

Regulations 72–77, Issued March 29, 1910, by Treasury Decision No. 1606.

### Depreciation.

72. Depreciation in value of mines by the removal of ore, if not otherwise ascertainable, may be prorated as in the case of sales of capital assets.

73. Depreciation in value of mines by the removal of ore, if in excess of 5 per cent. of investment, to be explained in return rendered.

75. Corporations leasing mines and paying royalties on ore mined not entitled to deduction for depreciation. But corporations owning mines are entitled to allowance for depreciation based on fair estimate, etc.

76. Removal of timber from timber lands, while depleting the lands to the extent of such removal, is regarded as a change in the form of assets and not a depreciation within the meaning of the act.

77. Deduction on account of depreciation of property must be based on lifetime of property, its cost, value and use.

Regulations 83–92, Issued February 14, 1911, by Treasury Decision No. 1675.

### Depreciation in Minerals, Oil, Etc.

83. In case of corporations whose business consists in part or wholly of mining, producing and disposing of deposits of nature (ores, coals, gas, petroleum and sundry minerals) the conduct of such business will be understood to comprehend two classes of gains or losses, viz.:

(a) The gain or loss resulting from the sale of capital assets, i. e., either the increment, or the loss, arising through possessing over a period of time the investment in the same.

(b) The trading or commercial gain attached to the conduct of the industry, the employment of working capital, the effort and risk involved.

84. In the ascertainment of net income, deduction will be allowed for depreciation arising from exhaustion of deposits of ore, mineral, etc., and for depreciation and obsolescence of improvements in accordance with general regulations respecting depreciation allowances, on the basis of the original capital investment cost of the properties concerned to the company reporting.

85. A further deduction will also be allowed, through not including the same at all in the item of gross income (item 3, Form 637), for the unearned increment represented in such properties as at January 1, 1909, which will be determined in general as follows:

86. An estimate should be made as of January 1, 1909, of the fair market value at that date of the minerals, etc., in deposit. This estimate should be formed on the basis of the disposal value of the minerals in total and exclu-

sive of value of improvements and development work. This valuation should also be reduced to a unit value—per ton, barrel, etc.[1]

87. The unit value as of January 1, 1909, ascertained as above outlined, would indicate the value to be attached at that date to the capital assets disposed of during any calendar year succeeding, and should be used in determining the unearned increment at January 1, 1909, which may be excluded entirely from the item of gross income, as before explained, in following manner, viz.:

Value at January 1, 1909, determined in manner outlined,
  of minerals, etc., which may be removed and disposed
  of in any year subsequent thereto,.................... $.......
Less the following:
  (a) Proportion of depreciation charge applying to exhaustion of minerals disposed of, ascertained as
    first explained herein on basis of original cost......$......
  (b) Royalty paid, if any, on minerals disposed of.......$......  $......
    Balance, being unearned increment at January 1,
    1909, to be excluded from gross income item........$......  $......

88. The precise detailed manner in which the estimate of value of minerals, etc., as at January 1, 1909, shall be formed, must naturally be determined upon by each corporation interested, but formal record of such estimates, together with all sustaining information shall be carefully filed so as to be readily accessible for reference. Values as stated, as determined at January 1, 1909, should be used in compilation in all subsequent years' excise tax returns. The question as to whether it subsequently develops the property possessed a greater quantity of mineral, etc., reserve than was in the aggregate estimated as of January 1, 1909, is immaterial. Any excess which may be developed will be considered as possessing the same value at January 1, 1909, as that which then may have been known to be in the property.

89. Each excise tax return (Form 637) should be accompanied with memorandum setting forth the extent in amount of the exclusion made from the item gross income for unearned increment realized during the year, as above outlined.

90. As the amount to be deducted for depreciation (paragraph 2 preceding) is to be formed on basis of the estimated reserve of minerals, etc., it follows that, if it develops such estimate is understated, the cost investment in the capital asset may be wholly extinguished before all mineral reserves are removed. When this is reached, further deductions for exhaustion of minerals should be discontinued but in such event, it will be noted, the allowance for unearned increment which is to be excluded entirely from gross income will be correspondingly increased.

91. In case of corporations leasing mines and paying royalties on minerals, etc., removed, the royalties paid are to be treated as expenses and deducted in ascertaining net income, as provided in general regulations. Any leasehold investment which the operating corporation may have in such properties, either through a payment originally made for acquirement thereof or for improvements made upon the property, to be accounted for in accordance with regulations governing depreciation allowances and disposition of capital assets.

92. In respect to properties of the character in question which may be acquired by a corporation after January 1, 1909, a deduction will be allowed

[1] NOTE.—Values as aforesaid should not be estimated on the basis of the assumed salable value of the output under current operative conditions, less the actual cost of production, because, as hereinbefore stated, the selling price under such conditions comprehends a profit both for carrying the investment in minerals, improvements, and working capital, and for conducting operations in respect of production and disposal of product. The value to be determined as stated must be on the basis of the salable value of the entire deposit of the aggregate units of minerals considered en bloc if disposed of in that form. Nor must such valuation comprehend any speculative value which might attach to a sale of the minerals en bloc; i. e., a value which might be obtained on the ground that the future would develop a much greater reserve of mineral deposits than were believed to exist at the time estimate as of January 1, 1909, was formed. Any value of this latter character would attach obviously to such additional reserves when developed in future.

only as to depreciation arising from exhaustion basis on original cost; no exclusion from gross income can be made for unearned increment, as profit arising in sale of such capital assets applies wholly to the period subsequent to January 1, 1909.

These regulations of February, 1911, were again promulgated without material change, in December, 1911, as Nos. 96–105, and remained in force without change until February, 1913, at which date original Nos. 86, 87, 88, and 90 were slightly amended. In compliance with these regulations, the Biwabik Company made the estimates required, and entered upon a suitable record book the following:

### January 1, 1909.

| | |
|---|---|
| Estimated tonnage unmined | 6,874,695 |
| Total appraised valuation of unmined ores | $5,413,822 |
| Appraised valuation per ton | .7875 |
| General ledger or capitalized value | $ 267,081 |
| Fee owner's valuation as represented by royalty | $2,062,408 |
| Net increment value | $3,084,331 |
| Rate of general ledger or capitalized value | .03885 |
| Rate of increment value | .44865 |

It thereafter maintained such book for each year, the entries for 1910 being as follows:

| | |
|---|---|
| Tonnage unmined January 1, 1910 | 6,331,874 |
| This company's capitalized value | $ 245,093 |
| This company's net increment value | $2,840,795 |
| Tons disposed of during the year 1910 | 544,353 |
| Capitalized value thereof | $ 21,148 |
| Net increment value thereof | $ 244,223 |
| Tonnage unmined January 1, 1911 | 5,787,521 |

When the company made its return for 1910, it deducted from its annual receipts for the sale of ore the total of this capitalized value and this increment value, being $265,372, treating these two items as being, not income, but the selling price of capital assets, and entered the remainder as its gross income. From this gross income it made the deductions permitted by statute, thus arriving at the net income, upon which it computed and paid 1 per cent. tax. Upon these facts, the District Court was of the opinion that the capitalized value could rightfully be deducted before stating gross income, but that the increment value could not, and, accordingly, judgment was rendered for 1 per cent. computed upon the item of $244,223.

A. C. Dustin, of Cleveland, Ohio, for plaintiff in error.

E. S. Wertz, U. S. Atty., of Cleveland, Ohio.

Before WARRINGTON and DENISON, Circuit Judges, and SATER, District Judge.

DENISON, Circuit Judge (after stating the facts as above). The proper application of this statute, to facts more or less analogous to those now involved, has recently been considered by the Supreme Court in a line of cases of which the Sargeant Land Co. Case (January 15, 1917) 242 U. S. 503, 37 Sup. Ct. 201, 61 L. Ed. 460, is the latest, and by this court in Doyle v. Mitchell, 235 Fed. 686, 149 C. C. A. 106, and in Cleveland, etc., Ry. Co. v. United States, 242 Fed. 18, —— C. C. A. ——, this day decided. The facts of the present case differ considerably from any of the others, and the inquiry must be whether the principle of decision involved in these cases may control or indicate the result to be reached here. This statute measures taxation by net income. It declares the net income to be what is left after certain deductions

from gross income. Obviously, we can make no headway in applying this measure, until we define "gross income"; and, it is equally sure, we can only learn what "gross income" is by first defining "income."

[1] It is urged that we are not concerned with the meaning of "income," because, under this statute, income is not the thing taxed, but is the measure of taxation. We do not appreciate the force of the claimed inference. "Income" is a word capable of definition. Of course, its definition may cover a variety of specific meanings, and its context may determine which specific meaning should be accepted; but no reason has been suggested, and none occurs to us, why the mere fact that the term is used as a yardstick for measuring taxation or something else, rather than as describing the thing upon which the tax rests, should indicate that one or another specific meaning is the right one. It is well known that Congress was driven to tax the privilege (according to its value as indicated by its net income) because of the failure of the law taxing "income" directly; and—to say the least—there can be no presumption that, between the old law and the new one, Congress had changed its idea of what the word "income" meant. When reduced to final terms, to say that "income," in this law, does not mean, generally, the same thing as it does in income tax laws, is to say that levying upon the income of a company a tax of 1 per cent. will produce $10, while levying upon the franchise of that company a tax of 1 per cent. of its income may produce $12; and we cannot approve that proposition.

It would have been perfectly natural for Congress to decide that the tax which it was to impose upon the privilege should be measured either by the amount of business done thereunder or by the proved value of the privilege. Either would have been a logical basis for such taxation. If the former had been the adopted theory, the tax would have been measured by total receipts, or by total sales, or by total disbursements, or by some combination of these measurements, and any thought of profits would have been utterly foreign to the scheme of measurement. The most casual inspection of the law shows that this theory was not adopted. On the contrary, all ordinary expenses and losses in the conduct of the business were expressly to be deducted, and only the remainder was to be taxed. Whether this remainder happened to be called net income or net profits was a matter of no consequence; by either name it was the same thing. It is of the essence of the law that a corporation doing a business of $100,000 and making $50,000 profit, is to be taxed 1 per cent. upon that profit, less the exemption, or $450, while a corporation doing a business of $10,000,000 and making no profit is not to be taxed at all. It is clear to a demonstration that Congress deliberately intended to tax the franchise according to its actual value to the user, as determined by the annual profit derived therefrom, without regard to its value as indicated by the amount of business done.

So, too, it is urged that we should not be concerned with this definition, because the statute itself carefully defines what the tax upon income shall be. As has been pointed out, this idea rests upon a clear misapprehension of the statute; the law does not purport to do this or anything like this. The statutory computation rests upon the assump-

tion that we already know what income is as distinguished from other matters; otherwise, it would be impossible to state that gross income which is the foundation of that statutory computation.

[2] We therefore are confirmed in our opening statement that, to rightly interpret this law, we must interpret and define "income." It must, by certain attributes, be distinguished out of the mass, or from other things with which it is compared. Distinctive definitions involve contrast. Since the law specifies "income," and not "sales," or "receipts," or "capital and surplus," or any other standard of measurement which might have been named, what should be set over against "income" to bring out this distinctive character? In every case in the Supreme Court and in the lower courts, including and since the Stratton's Independence Case, it has been assumed that the receipts and accumulations of a business corporation are of two classes: One, those which constituted its gross income; and the other, those which represented the sale or conversion of its capital—and the controversy has always been as to the respective definitions of those two classes. We accept this as the rightful criterion, not only because it has been universally accepted, but because we think it must be right. The only alternative is to say that all receipts from the conduct of a business according to its intended plan are income. To say this is to destroy the effect of carefully selected words. It would involve the conclusion that, in case of a company organized to buy land and subdivide and sell lots, all receipts from the sales of lots were "gross income," even though the lots were all sold and the invested capital not realized, and that, since only disbursements made during the year can be deducted, the capital so invested in one year and realized the next year would be taxable net income. So far as words are concerned, it is impossible to say that the law did not intend to go to that very extent; but to say so would be such a departure from the administrative practice and rules which have prevailed from the beginning, and from what we think the law has always been assumed to mean that we are unwilling to take so radical a step.

[3] So we come to what we deem the decisive question, viz.:

"So far as the selling price of the ore in 1910 represented its actual value to the company in the ground on January 1, 1909, was it income or was it the sale price of capital assets?"

In its general aspect, this question is the same as that discussed in Doyle v. Mitchell. We may here refer to that opinion, without repeating it at length, for the matters there stated. Unless that case was wrongly decided, the question must be whether this case is to be distinguished in principle. Certainly there is no great difference in the inherent character of the assets transferred and sold. The ore below the surface and the trees above were interests in realty until they were severed. Upon severance and preliminary treatment, each became the raw material for further process of manufacture. The extent and quality of each before severance were determined by expert appraisal. Each, before severance, had a known and realizable market value. Each had been purchased in its unsevered form by the company taxed, and each, while still in that form, had increased in market value after

the purchase and before the law was passed, and had then further increased before severance, and in each case the market value when the law went into effect had been ascertained and stated accurately and in good faith. What are the distinctions urged?

The first is that the company was a mining company, and not a manufacturing company. The law makes no such distinction, and there can be no magic in the word "mining" as part of a corporate name. Where a mining business is of the character described in the Stratton's Independence Case, it is clear enough that there is great, if not insuperable, difficulty in ascertaining the value of the ore in the ground at a fixed date. The whole subject may well be thought too speculative to justify attributing to "depletion of capital" any ore which had been removed. The annual operations of such a mine are expected to and often do develop new ore bodies of even greater value than those removed. Not only are the value and the extent of the ore in place unknown, but the cost of removal is highly uncertain, since it will depend upon unknown and constantly changing conditions. The same considerations apply more or less perfectly to the gas and oil operations and to the coal mining which have been considered in decided cases. These things are so typical of mining operations, as a class, that perhaps we should apply to everything belonging in that general class a general rule which will prevent an appraisal of the ore in place as a capital asset at the beginning of the period. The present case does not belong in that class. The parties have stipulated to the extent and value of the ore in the ground on January 1, 1909. Nothing could be more definite or certain. As was said in the statement of facts, this was a quarrying operation. It involved no elements of uncertainty, except those future contingencies which affect the value of all raw materials. In spite of the name of the company, the business more nearly approximated manufacturing than it did mining, as the latter term is commonly understood.

[4] It is next said that the company was not the owner, but only a lessee—indeed, the internal revenue department made this the controlling fact, since, by its rules and regulations, it permitted mining companies who owned the fee of the lands in which the ore was located to treat as capital assets the value of their ore in the ground at the beginning of the year, if they were able to ascertain that value, but the depatrment refused to extend this ruling to cases where the mining company was only a lessee. (Regulation 75, supra; but see, also, regulation 91, supra.) It is difficult to appreciate the supposed distinction. This company was removing 500,000 tons per year. The deposit was 6,000,000 tons. There were 30 years remaining of the period permitted for removal. The lessee's interest could be and had been bought and sold, and it had been salable for the stipulated price at the beginning of the taxing period. Counsel for the government has not pointed out the reason for this distinction made by the department. We suppose it must lie in the thought that, since the lease may be forfeited or given up before the ore is all removed, the annual operations must be treated as an annual purchase from the lessor, at the royalty price, of the amount each year removed, and so all the value realized above the royalty must be income for the year. We doubt the force

of this construction. It comes to saying that what would otherwise have been capital at the beginning of the year must not be so treated, because the company might have elected or been compelled to forfeit to one who had an underlying claim, or to saying that the owner of mortgaged mining property could not consider the existing value of his equity as his capital, because, if conditions changed, he might lose it by foreclosure. We think that the lessee of such property and under such a lease is as much entitled as is the owner of the fee to treat the value of his interest in the ore in the ground at the beginning of the tax period as his capital—indeed, the lessee's right to do so, is, in some respects, the stronger of the two, as hereafter pointed out. Such a lease, as applied to this situation, is in every substantial way pro tanto a purchase.

Finally, it is urged that this case is controlled by the decision of the Supreme Court in the Sargeant Land Company Case. The mining leases involved in that case and in this one seem to be identical in substance, and it is now said with great plausibility that the ore in the ground and affected by such a lease belongs partly to the lessor and partly to the lessee, and that, if the interest of the lessor is not capital assets, no more is the interest of the lessee, and that, if the receipts of the former are income, so must those of the latter be. We are convinced that the analogy between the two cases is superficial and not substantial. In that case the Supreme Court had to determine whether the royalties received by the lessor were income or were a depletion of capital. Many considerations led to the conclusion that they must be treated as income. The contract was a "lease," the receipts were "royalties," and royalties, being rentals, are inherently income, and have been commonly so considered. All these things seem to have affected the conclusion of the court, but, after all, the dominating thought appears to be that, when land is devoted to mining, it is put to only one of those productive uses of which it is capable, and that the product of the use should be called income. The land itself is the chief thing; after the mining is finished, the land remains suitable for other uses; and the fact—if it is a fact—that the minerals are the greater part of its value cannot operate to make the incidental overshadow the principal. These reasons do not apply at all to the case of the lessee whose existing interest, at the beginning of the taxing period, over and above the royalty which he must pay, amounted to $3,000,000; his entire interest was each year, as far as he went, consumed and exhausted forever; he did not have remaining the principal thing, the land, which he could put to some other use; the receipt in 1910 of his January 1, 1909, interest in the ore was not the offshoot and income of his property; it was the transformation and eating up of the very property, and of the whole of it. We therefore think that applying the principle of the Sargeant Case results in holding that these receipts were from the sale of capital assets and not from income.

It results in our opinion that, as exemplified in its 1910 operations, the Biwabik's 40 cents a ton profit was income, upon which it was properly taxed, and which tax it has paid; but that its 4 cents per ton "capitalized value" and its 45 cents per ton "increment value," existing January 1, 1909, but realized during 1910, were not income, and that

242 F.—2

these items were rightly omitted from its report. We see no distinction between that value of its interest in the ore as existing January 1, 1909, which was based upon the amount it had actually paid therefor, and that value of its other interest in the same ore at the same time, which had resulted from the appreciation of its market value before the taxing law went into effect.

The judgment below must be reversed. Ordinarily, a new trial would be awarded; but the record seems to indicate that there is permanent agreement upon all material facts, and, if so, a new trial would be unnecessary. Unless, before the mandate goes down, counsel for the government indicates a desire for a new trial, the order will be that the judgment be reversed, and the court below directed to dismiss the petition. This disposition of the matter will then be of such final character that the case will be ripe for review by certiorari, if the Supreme Court should think review advisable.