**REINECKE, Collector, v. SPALDING.**

Circuit Court of Appeals, Seventh Circuit.
January 2, 1929.

No. 4074.

Dwight H. Green, of Chicago, Ill., for appellant.

John M. Zane, of Chicago, Ill., for appellee.

Before EVANS, PAGE, and ANDERSON, Circuit Judges.

PAGE, Circuit Judge. The leases, for iron ore bearing lands, in this case, were involved in McHale v. Hull (C. C. A.) 16 F. (2d) 781, and were made by appellee in that case and by plaintiff (appellee) here, and others, as lessors. The following matters present in this case are not found in the McHale Case: (a) A properly authenticated bill of exceptions; (b) a jury trial; (c) each party asked an instructed verdict.

A verdict was directed for plaintiff, who sued to recover an alleged excess of taxes, paid under protest, for the years 1917 and 1918, on her income under those leases.

There were seven leases, made, one in 1901, four in 1902, one in 1903, and one in 1905, for the mining of iron ore from lands in Minnesota, in which plaintiff owned a one-sixth interest. The compensation to lessors was a royalty of 25 cents per ton, payable quarter annually. No lease was for a longer term than 50 years. Under the 1905 lease, the term, as to several tracts, was 45 years, but as to one tract was 50 years. Under the 1903 lease, the term was 25 years. Under one 1902 lease, the term was 50 years for mining five-sixths, but for mining a certain described one-sixth was for only 25 years. The provisions as to the annual minimum to be mined varied. Several, if not all of the leases, gave the lessees the right to cancel on 30 days' notice.

The sole controversy is over the correctness of the government's method of arriving at the value of the iron ore in the ground on March 1, 1913, a matter not covered by the revenue acts in question, nor by any regulation of the Treasury Department.

The only thing the government's one witness testified to was the general custom in the mining business with reference to determining allowance for depletion. In response to a question by the court, he said that in making such determination they assumed that the value of the mineral in place had been arrived at—that is to say, they assumed the very thing here in controversy.

For plaintiff, several witnesses testified, and their qualification is not questioned, that the March 1, 1913, value of the ore in place was over 25 cents per ton.

The government's case is based upon several assumptions: First, it assumes the number of tons of ore in place on March 1, 1913 —and the correctness of that assumption is not controverted; second, it states the average tonnage mined in the years 1913 to 1918, inclusive; third, applying that average, it assumes that the whole tonnage will be mined in 40 years, and that plaintiff's one-sixth in-

terest in the leases will yield her in 40 years, at 25 cents per ton, $7,849,287.18. And, therefore, the government says the way to arrive at the market value on March 1, 1913, of the ore in place is to find the March 1, 1913, value of the $7,849,287.18—to be paid, as assumed, over a period of 40 years. By that process, the value of one ton of ore in place on March 1, 1913, was found to be .0886243, and the whole value of plaintiff's one-sixth interest, as of that date, was found to be $2,782,551.64. The government's figures and processes are set out in a letter to plaintiff, pertinent portions of which are as follows (numerals at left are ours):

| | | |
|---|---|---|
| "Ore reserve, March 1, 1913, according to the Minnesota Tax Commission, as shown on questionnaire of the Royal Mineral Association .......... | 191,417,150 | tons |
| Less: Advance royalty payment by lessees, prior to March 1, 1913, on.............. | 3,034,258 | tons |
| (1) Net tonnage as of March 1, 1913 ......................... | 188,382,892 | |
| (2) Your interest, one-sixth, March 1, 1913.................. | 31,397,148.7 | tons |
| (3) Total average extraction, 1913 to 1918, inclusive............. | 4,770,000 | tons |
| (4) Maximum life of mine allowed | 40 | years |
| (5) Interest rate allowed.......... | 6% | |
| (6) Royalty rate per ton........... $ | 0.25 | |
| (7) Your capital sum returnable in 40 years .................. | 7,849,287.18 | |
| (8) Present worth of your interest, March 1, 1913............ | 2,782,551.64 | |
| (9) Unit cost per ton, March 1, 1913, basis for depletion...... | 0.0886243 | |
| (10) Depletion in 1916, 1,096,015.4 tons at $0.0886243.............. | 97,133.60 | |
| (11) Depletion in 1917, 1,040,289.4 tons at $0.0886243.............. | 92,194.92" | |

We are of opinion that the government's method of arriving at the March 1, 1913, value of the ore in place is wrong for many reasons, some of which are:

(a) The assumption that the value of the leases to plaintiff, at the end of 40 years, will be $7,849,287.18 is far from correct. That is only the principal she will receive for her one-sixth interest within the time taken to mine the whole of the ore. The leases were and are worth, also, the interest upon the payments made quarterly over the mining period. As shown by the letter, supra, there were mined in each year, 1916 and 1917, in excess of 1,000,000 tons, from which she received, each year, in excess of $250,-000. At five per cent. that would double in 20 years, and in 40 years would be worth to her nearly three-quarters of a million dollars. All interest would be in excess of the $7,849,287.18. On the government theory, it would take all interest to make that amount.

(b) It is reasonably probable that, where there is a large body of ore to be mined, extending over a term of years, the amount mined annually would vary greatly, being governed by the equipment employed, the market demands, and prices, and oftentimes by the fact that the lessee had, or did not have, requisite capital to operate the mines. For those reasons, the average extraction for the years 1913 to 1918 would, in all probability, be no fair basis for arriving at an average during the whole term. That this is so, is evidenced by the fact that the tonnage, shown by the letter to have been mined in 1916 and 1917—2 of the 6 years used by the government as the basis for arriving at the term of 40 years—would reduce the government's theoretical period of 40 years by one-fourth, so that plaintiff's whole tonnage at the 1916 and 1917 average would be mined in 30 years, thereby, on the government's theory, very materially increasing the market value on March 1, 1913. Forty-five per cent. of the amount mined in those 6 years was mined in the two years, 1916 and 1917, so that the average for the other 4 years was less than 700,000 tons.

(c) With the exception of tract 6, which may be mined, under the lease made in 1905, within 50 years, there is no lease that runs for a term of 40 years after March 1, 1913. Under the 1901 lease, one-sixth had to be mined out in 25 years. The 1903 lease was made for a term of 25 years. So that the estimated period of 40 years extends far beyond the time permitted by the leases and within which plaintiff would have received all of her money if all the ore had been mined.

(d) The right to mine under the leases was not a sale of the iron ore. The leases here in question are similar to, if not identical in form with, the leases involved in a number of cases in the Supreme Court, one of which is Von Baumbach v. Sargent Land Co., 242 U. S. 503, 37 S. Ct. 201, 61 L. Ed. 460. The government there contended that the payments for ore mined under the leases were income within the meaning of the Act of 1909 (36 Stat. 11), and did not represent the conversion of the investment of the corporations from ore into money, as contended by the land company. The court adverted to the fact that in Pennsylvania the contracts were leases in name only, but were in fact conveyances of the ore in place as part of the realty, and that the so-called royalties merely represented payment for so much of the land, and were in no just sense income, but were conversions of the capital. The court pointed out that, under the Minnesota deci-

sions, there is no sale under such contracts. It was found not necessary to decide as between the Pennsylvania and the Minnesota cases, because the court found that the royalties were income within the meaning of the 1909 Revenue Act.

United States v. Biwabik Mining Co., 247 U. S. 116, 38 S. Ct. 462, 62 L. Ed. 1017, was also under the Act of 1909. In that case, the court said that the Circuit Court of Appeals (242 F. 9) had distinguished the case before it from the Sargent Land Co. Case, and pointed out that the Circuit Court of Appeals concluded by saying:

"We therefore think that applying the principle of the Sargent Case results in holding that these receipts were from the sale of capital assets and not from income."

The Supreme Court said it did not agree with the Circuit Court of Appeals as to the effect of the Sargent Land Co. Case, and concluded:

"The lessee takes from the property the ore mined, paying for the privilege so much per ton for each ton removed. * * * He is, as we held in the Sargent Land Co. Case, in no legal sense a purchaser of ore in place."

Lynch v. Alworth-Stephens Co., 267 U. S. 364, 45 S. Ct. 274, 69 L. Ed. 660, involved a tax under the 1917 Revenue Act (39 Stat. 1000) one of the acts here in question, and the holding was that there was no conveyance of the title to ore in place.

The leases might have been canceled at any time, and it is evident, for many reasons, that there was no sale of the ore when the leases were made.

Section 5(a) Eighth (b) of the Revenue Act of 1916 (39 U. S. Stats. at L. pp. 756, 759) provides that there shall be an allowance for depletion "not to exceed the market value in the mine of the product thereof, which has been mined and sold during the year for which the return and computation are made." This language, by its terms, has nothing to do with the whole body of the ore in place. It is not related to the market value of all of the tonnage in the mine, but the depletion relates to the market value in the mine of the product mined and sold during the year for which the return is made.

If the amount mined in 1916 was ever sold, so far as this taxing question is concerned, it was sold in 1916, and if it then had a price that price was 25 cents per ton royalty then paid plaintiff. And the same is true as to every year. If it had all been mined in 1913, unquestionably the market value would have been 25 cents per ton. It cannot be possible that the 1913 value can be fixed by the lease at .0886243, and at the same time have the lease yield to plaintiff 25 cents per ton for 1913, and every succeeding year of operation. There could be no increase in value, because the price paid was fixed by the lease prior to 1913. A royalty of that kind, when paid, is a payment for iron ore, in Burke Hollow Coal Co. v. Lawson, 151 Ky. 305, 151 S. W. 657, the Court of Appeals of Kentucky said:

"The 'royalty' is the price paid for coal as it lies in the earth. This is what it sells for."

It seems clear that the ore, mined in 1916, was worth to plaintiff 25 cents per ton; that that price contained two elements, mine depletion and profit; and that the way of arriving at the profit was to take the fair cash market value on March 1, 1913, of the tonnage mined in 1916 (which was shown to be 25 cents per ton), less the interest carrying charge of 5% from March 1, 1913, to 1916.

It seems to us that the impossibility of applying the government's theory may be illustrated by the following: Assume that of the seven leases in question all of the provisions were identical, except that six of the leases were for 1, 2, 3, 4, 5, and 6 years, respectively, and the seventh was for 40 years, and that from each tract, during the first year, there were mined 1,000,000 tons of iron. It must be clear that, on the government's theory, the ore in place on March 1, 1913, although of like kind and quality, would, under each lease, have a materially different value from that covered by the other leases. Under the one-year lease the value of the ore would be 25 cents per ton, and under the 40-year lease it would be less than one cent per ton.

We are of opinion that appellant's method of arriving at the market value of the ore in question on March 1, 1913, is unsound in principle, and, in any event, is based upon too many uncertainties and assumptions to be of any reliable use in ascertaining the value.

The judgment should be, and is, affirmed.