HECLA MINING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 69916, 74813. Promulgated February 11, 1937.

*John P. Gray, Esq.*, and *Arthur J. Pellette, Esq.*, for the petitioner.
*Mason B. Leming, Esq., F. T. Donahoe, Esq.*, and *James D. Head, Esq.*, for the respondent.

ARUNDELL: The main point in issue in these proceedings is whether or not the petitioner made a statutory discovery of a vein within the Hecla properties after February 28, 1913. If it did, it is entitled to depletion deductions upon removal and sale of ore therefrom in the taxable years.

We have found upon consideration of the evidence that there are present in these cases the facts prescribed by statute as constituting a discovery, and we hold that there was a discovery of the Intermediate vein within the meaning of section 114 (b) (2) of the Revenue Act of 1928. There remains on this issue only the matter of setting out some of the reasons for our conclusion.

The petitioner acquired the group of mining claims here involved prior to 1913, and at March 1, 1913, it was operating the Hecla mine. The parties have stipulated that the respondent allowed a March 1, 1913, value of $6,400,000 based on a recoverable tonnage of 3,300,-338. The tonnage and valuation so allowed appear to be based on a form D filed by the petitioner in May 1920, and on subsequent representations by the petitioner as to additional ore in the east ore body. Although there is some difference between the value claimed in the form D in evidence and the value allowed, the respondent alleges that the value determined was based solely on representations of the petitioner. According to the form D filed, and the schedules attached thereto, the value and tonnage claimed as bases for depletion allowances included only the developed and probable ore in the Hecla vein and the east ore body. Mining operations had been carried on in both of these ore bodies prior to March 1, 1913. Depletion deductions allowed from March 1, 1913, to December 31, 1926, amounted to $5,718,926.85, leaving $681,073.15 of the March 1, 1913, value unexhausted. This figure, $681,073.15, is stipulated to be the difference between actual depletion sustained on the basis of the value allowed and the depletion allowable under the Revenue Act of 1913. No claim is here made for this amount.

Prior to the filing of the petitions herein the petitioner unsuccessfully sought to have the respondent revalue its ore bodies as of March 1, 1913, and also to obtain a discovery valuation for its Intermediate ore body as of March 1, 1916. The respondent's refusal as to both of these claims was assigned as error in the petitions filed. At the hearing the petitioner abandoned the claim for a March 1, 1913, revaluation, and the petitions were amended to claim a statutory discovery of the Intermediate vein on September 30, 1915.

The statute upon which the allowance of depletion deductions depends in these cases, section 114 (b) (2) of the Revenue Act of 1928,[1] is set out below.

The several taxing statutes, at least those prior to that of 1932, show a progressive liberality on the part of Congress toward the allowance of deductions for the depletion of minerals. No deduction at all was allowed under the 1909 excise tax statute. The 1913 Act allowed a deduction of 5 percent "of the gross value at the mine of the output." The 1916 Act gave a "reasonable allowance" for depletion "not to exceed the market value in the mine of the product * * * mined and sold during the year." See *Von Baumbach* v. *Sargent Land Co.*, 242 U. S. 503. The 1918 Act was the first to grant discovery depletion, limited to "mines * * * discovered by the taxpayer." Sec. 234 (a) (9). The same wording appears in the next two succeeding statutes. Sec. 234 (a) (9), Revenue Act of 1921; sec. 204 (c), Revenue Act of 1924. Under these statutes a discovery consisted only of ore bodies wholly outside of and separate and distinct from existing mines. Cf. *Clarence D. Robinson*, 8 B. T. A. 778; *Alamo Coal Co.*, 31 B. T. A. 869. The Revenue Bill (H. R. 1, 69th Cong., 1st sess.) which became the Revenue Act of 1926, as it was passed by the House and introduced in the Senate, allowed discovery as in the prior statute, i. e., "in the case of mines discovered by the taxpayer." An amendment was proposed from the floor of the Senate, but not adopted, providing that:

Discoveries shall include minerals discovered or proven in an existing mine or mining tract by the taxpayer after February 28, 1913, not included in any prior valuation. (See pp. 2944 and 3430, Congressional Record.)

Subsequently the following amendment, offered from the floor, was adopted by the Senate, (p. 3775, Congressional Record) :

Discoveries shall include minerals in commercial quantities contained within a vein or bed discovered in an existing mine or mining tract by the taxpayer after February 3, [sic] 1913, if the vein or bed thus discovered was not merely the extension of a continuing vein or bed already known to exist, and if the discovered minerals are of sufficient value and quantity that they could be separately mined and marketed at a profit.

---

[1] (2) DISCOVERY VALUE IN CASE OF MINES.—In the case of mines discovered by the taxpayer after February 28, 1913, the basis for depletion shall be the fair market value of the property at the date of discovery or within thirty days thereafter, if such mines were not acquired as the result of purchase of a proven tract or lease, and if the fair market value of the property is materially disproportionate to the cost. The depletion allowance based on discovery value provided in this paragraph shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property upon which the discovery was made, except that in no case shall the depletion allowance be less than it would be if computed without reference to discovery value. Discoveries shall include minerals in commercial quantities contained within a vein or deposit discovered in an existing mine or mining tract by the taxpayer after February 28, 1913, if the vein or deposit thus discovered was not merely the uninterrupted extension of a continuing commercial vein or deposit already known to exist, and if the discovered minerals are of sufficient value and quantity that they could be separately mined and marketed at a profit.

This provision remained in the Revenue Bill when it went to conference, where it was changed to read as follows, in which form it was enacted into law:

Discoveries shall include minerals in commercial quantities contained within a vein or deposit discovered in an existing mine or mining tract by the taxpayer after February 28, 1913, if the vein or deposit thus discovered was not merely the uninterrupted extension of a continuing commercial vein or deposit already known to exist, and if the discovered minerals are of sufficient value and quantity that they could be separately mined and marketed at a profit.

The last quoted provision was enacted as a part of section 204 (c) (1) of the Revenue Act of 1926, and was reenacted without change in section 114 (b) (2) of the Revenue Act of 1928.

The significance of the quoted provision is that under it discoveries need not be in mines separate and distinct from those previously operated; they may consist of veins or deposits "in an existing mine or mining tract." It is under this provision that this petitioner claims a discovery. The facts here satisfy beyond question some of the requirements of this provision. The Intermediate vein—whether considered a separate vein or not—was a vein or deposit bearing minerals in commercial quantities. It was discovered in an existing mine after February 28, 1913. There does not seem to be any dispute as to the mineral contents of the vein being of sufficient value and quantity that they could be separately mined and marketed at a profit. This leaves in controversy only the question of whether the Intermediate vein was or was not merely the uninterrupted extension of a continuing commercial vein or deposit (the Hecla vein) already known to exist.

We think it obvious under the above quoted provision that if a vein or deposit is found within a mine and has no connection whatever with a known vein, it constitutes a discovery. Various definitions of mineral veins have been given in the mining cases which have arisen under mining laws, particularly the Federal mining laws which grant extralateral rights to the locator of the apex of any "mineral vein, lode, or ledge." Sec. 2322, Rev. Stat. Lindley[2] says that these terms—vein, lode, or ledge—"Generally speaking, * * * are used interchangeably." In the same section of the text it is pointed out that of the three terms, "the word 'lode' is the more comprehensive. A lode may, and often does, contain more than one vein." In the majority of the cases cited to us it appears that the words "vein" and "lode" are treated as being synonymous. A leading case is *Iron Silver Mining Co.* v. *Cheesman*, 116 U. S. 529, where the Court quoted with approval the definition given by the trial judge in that case in his charge to the jury. We quote excerpts from the charge:

---

[2] Lindley on Mines, 3d Ed. § 290.

\* \* \* To determine whether a lode or vein exists, it is necessary to define those terms; and, as to that, it is enough to say that a lode or vein is a body of mineral, or mineral-bearing rock, within defined boundaries in the general mass of the mountain. In this definition the elements are the body of mineral or mineral-bearing rock and the boundaries; with either of these things well established, very slight evidence may be accepted as to the existence of the other. A body of mineral or mineral-bearing rock in the general mass of the mountain, so far as it may continue unbroken and without interruption, may be regarded as a lode, whatever the boundaries may be. In the existence of such a body, and to the extent of it, boundaries are implied. On the other hand, with well-defined boundaries, very slight evidence of ore within such boundaries will prove the existence of a lode. Such boundaries constitute a fissure, and if in such fissure ore is found, although at considerable intervals in small quantities, it is called a lode or vein.

\*    \*    \*    \*    \*    \*    \*

\* \* \* A continuous body of mineral or mineral-bearing rock, extending through loose and disjointed rocks, is a lode as fully and certainly as that which is found in more regular formation; but if it is not continuous, or is not found in a crevice or opening which is itself continuous, it cannot be called by that name. In that case it lacks the individuality and extension which is an essential quality of a lode or vein.

\*    \*    \*    \*    \*    \*    \*

It is a question to be decided by the weight of testimony rather than the number of witnesses; upon the effect which the testimony has on your minds, accepting that which seems to you to be worthy of belief and rejecting the other.

In discussing exceptions to the above charge the Supreme Court added:

\* \* \* Certainly the lode or vein must be continuous in the sense that it can be traced through the surrounding rocks, though slight interruptions of the mineral-bearing rock would not be alone sufficient to destroy the identity of the vein. Nor would a short partial closure of the fissure have that effect if a little farther on it recurred again with mineral-bearing rock within it.

One much cited definition, quoted in *Eureka Consolidated Mining Co.* v. *Richmond Mining Co.*, 8 Fed. Cas. 819, Case No. 4,548, is that a "lode" is "that formation by which the miner could be led or guided. \* \* \* Some formation within which he could find ore and out of which he could not expect to find ore, was his lode."

Referring to *Iron Silver Mining Co.* v. *Cheesman, supra*, it is to be noted that emphasis is placed on the elements of (a) "the body of the mineral or mineral-bearing rock" and (b) "the boundaries." This is followed by the statement that "with either of these things well established, very slight evidence may be accepted as to the existence of the other." In the present case both sides produced expert witnesses who have examined the Hecla mine and who testified as to their observations of the workings in the mine. There are differences of opinion between them as to some of the indications within the mine which go to a determination of whether the Intermediate vein is separate from or a part of the Hecla vein. For instance, on

the matter of boundaries, one of petitioner's witnesses, with over 30 years' experience in the mines in the Coeur d'Alene district, testified that the distinction between the vein rock and the country rock in the Hecla mine was sharp and clear. On the other hand, respondent's witnesses, who were men having considerable mining experience, asserted that the boundary was very vague and indefinite; that there was no definite sharp wall. The witnesses are equally at odds on the other element above mentioned, namely, the body of the mineral or mineral-bearing rock. Petitioner's witnesses were of the opinion that there was a difference in the character of mineralization between the two veins which served to distinguish them, while those for the respondent found no such difference. The witnesses for both sides were men of many years of practical experience in mines of all kinds in all parts of the world. We find no reason to question the qualifications of any of them to answer the numerous queries put to them on matters of geology and practical mining. Petitioner's witnesses, however, had the greater degree of familiarity with the Coeur d'Alene district as a whole and the Hecla mine in particular. They have had more or less intimate connections with and practical experience in the mines in that district for many years. They were in the better position to acquire detailed knowledge of the geology of the district and of practical mining operations. We were, on the whole more impressed with the testimony of the petitioner's witnesses and have given it the greater weight where there is a conflict between the opinions expressed. Cf. *Iron Silver Mining Co.* v. *Cheesman, supra.* The testimony of petitioner's witnesses compels the conclusion that the Hecla and Intermediate veins were separate ore bodies.

The view of some of the courts, following the *Eureka* case, *supra,* is that identification of veins or lodes is to be accomplished principally by determining whether there is any formation that a miner can follow and find ore. Counsel for the respondent places some emphasis on this definition. If we apply this definition we must again conclude that the Hecla and Intermediate veins were separate. The Intemediate vein was not located by following a formation within which the miner could expect to find ore. The evidence on this point is clear. In December 1913 the drift on the 900 level was being extended eastward on the Hecla vein. The vein at that point contained little or no ore, but the shear zone was strong, with gouges along the walls and occasionally quartz seams. This formation ran into a fault and at that point the drift was turned south—away from the shear zone in which ore might be expected to be found. Following the fault the drift cut through a small vein of ore and then, continuing south through country rock for about 15 feet, the Intermediate vein was found. This work was described by the shift boss in charge of the crew that cut the drift into the branch vein

and the Intermediate vein. We are satisfied that when the drift was cut into the branch and Intermediate veins the miners had departed from the formation which embodied the Hecla vein and in which it migh be expected that ore would be found.

The controversy as to whether there were one or two main veins in the Hecla mine really involves a comparatively short area of a hundred feet or so on the 900, 1600, and 2000 levels where the veins approach each other. At other points on the various levels the veins are physically separated by greater thicknesses of barren quartzite. On the 600 level, as far as it has been explored to date, the two veins are separated by a minimum distance of about 45 feet. On the 900 level the veins are more than 30 feet apart at the point of nearest approach; they separate going westward and at the western limit of exploration on the Intermediate vein, some 1,500 feet from the point of discovery, they are about 250 feet apart. On the 1200 level a noncommercial branch vein some 300 feet in length runs from the Hecla to the Intermediate vein. Measuring across the Hecla and Intermediate on this level they are separated by a minimum of 40 feet of country rock. They are 250 feet apart at the western terminus of the drift on the Intermediate vein, and in a crosscut near the east end of that vein the two are separated by a distance of 75 feet. On the 1400 level the separation at all points is at least 50 feet. On the 1600 level the veins are separated at their nearest approach to each other by about 7 feet of unmineralized quartzite. They further separate both east and west from the point of nearest approach and at the eastern and western ends of the parallel drifts they are respectively 50 feet and 200 feet apart. At the point of nearest approach on the 2000 level, the veins are separated by from 3 to 6 feet of quartzite; at the most westerly and easterly points of exposure of both veins they are about 75 feet apart. On the lower levels the Hecla vein is exposed only in crosscuts and where so exposed it is separated from the Intermediate vein by a minimum of 10 feet of quartzite.

Considerable stress is placed by counsel for the respondent on the removal of ore through continuous stopes.[3] As we see it, this is not decisive of the question of the number of veins in a mine. This has to do with a method of mining rather than with geology. We can see of course that extensive, continuous stoping could well be considered as following a continuous vein, for it is not likely that a miner would work extensively above the level if there was no commercial ore. But in this case it is at least doubtful whether there was continuous stoping through the length of the two veins. The

[3] *Stope.*—An excavation from which the ore has been extracted, either above or below a level, in a series of steps. A variation of step (Standard). Usually applied to highly inclined or vertical veins." Fay's Glossary of Mining and Mineral Industry.

stope maps in evidence, being vertical longitudinal sections of the mine workings, do not make it clear. At points where the veins approach each other these maps bear markings indicating an overlapping of stopes rather than a continuity. It is undisputed that there was a continuous opening from one vein to the other, and in some places the veins were sufficiently close that they were worked from one wide opening which in a sense may be said to be a continuous stope in that it laterally embraced both veins. Maps of the mine workings made by respondent's witnesses on their examination of the mine do not show continuous stoping; on some of the levels these maps definitely show breaks in the stoping.

So far our discussion has proceeded on the matter of determining only whether the petitioner has made a case within that part of the discovery provision which includes as discoveries "minerals in commercial quantities contained within a vein or deposit discovered in an existing mine or mining tract." If the provision just quoted stood alone it might require that there be a complete absence of identity of structural geology between the known and the newly found vein in order to constitute a discovery. A close similarity would be reason to suspect the new as being but a continuation of the old. But the statute removes this possibility by including in discoveries a newly found vein if it "was not merely the uninterrupted extension of a continuing commercial vein or deposit." The qualifying words in this statutory provision are significant. They are "uninterrupted", "commercial", and "continuing." It is not to be presumed that these were inserted without a purpose, especially in view of the legislative history of the provision to which reference has been made above. They broaden considerably the scope of the provision beyond what it otherwise would be. Whether or not a vein is an extension of another is a matter of geology, often difficult to decide. Geology, it must be recognized, is not an exact science. The highest authorities in this field differ in their opinions on such matters as classification of veins as to their source, age, and method of formation. The reports in the many cases involving apex questions readily demonstrate the diversity of opinion among geologists and the difficulty of establishing the identity of mineral veins. The question of whether two ore bodies are part of one vein or are separate veins is, as held in the *Iron Silver Mining* case, *supra*, to be decided by the weight of the evidence. It may be that recognition of the difficulty of deciding this question was the motive that prompted Congress to broaden the discovery provisions to include a vein or deposit that is not merely the uninterrupted extension of a continuing commercial. As we construe this provision, it means that there need not be a complete absence of similarity between a known deposit and one newly found in order for the finding of the latter to be a statutory discovery. There might be

sufficient similarity between the two deposits that they might fairly be considered as parts of one vein, but there could nevertheless be a statutory discovery if the two were separated by a substantial interruption. A slight interruption, a small fault, or the pinching out to noncommercial proportions for a short distance probably would not meet the intent of the statute. It is well known that mineral veins are not of uniform thickness or richness of mineral matter throughout their course; they are subject to displacement by faults; they pinch and swell; fissure veins are subject to partial closure. In apex litigation it has been held that a "slight interruption of the mineral-bearing rock would not alone be sufficient to destroy the identity of the vein." *Iron Silver Mining Co.* v. *Cheesman, supra.* The statute here involved does not stop with allowing discovery in respect to a vein or deposit found within a mine, but adds to what might generally be considered a separate vein or deposit, a commercial deposit that is not merely the uninterrupted extension of a continuing commercial vein. On the matter of the interruption between the deposits in the Hecla mine, the weight of the evidence is on the petitioner's side. The two ore bodies were separated by a substantial interruption, consisting of unsheared, unmineralized quartzite. At no point did the shearing extend laterally from one ore body to another. As petitioner's witnesses say, going down on either vein and staying within its walls, the other would not have been found. It is our opinion that the barren quartzite between the veins was in interruption of sufficient magnitude to require a holding that the Intermediate vein was not merely an uninterrupted extension of the Hecla vein.

The interruption between the commercial parts of the ore bodies was greater than that between the shear zones on most of the levels. As set out above, the initial mining was on the Hecla vein, progressing eastward from the shaft. The eastern terminus of the *commercial* ore in that vein was more than 400 feet from the western limit of commercial ore in the Intermediate vein on the 900 level on which the discovery was made. There is a 300 foot separation on the 600 level, over 200 feet on the 1200 level, and over 100 feet on the 1400 and 1600 levels. On the 2000 level the commercial ore appears to run parallel for some distance, but with a longitudinal separation of several feet of unmineralized quartzite. In view of these facts it can not be said that the Intermediate vein was an "uninterrupted extension of a continuing commercial vein."

Although the Intermediate vein was first located in December 1913, its ore contents were not sufficiently blocked out until September 30, 1915, to support a determination that the ore was of a quantity and value that it could be separately mined and marketed at a profit. On that date the 600 level had entered the ore body and had

penetrated it a distance of 10 or 15 feet. The 900 level had been drifted about 450 feet with one-floor stopes over 200 feet in length and two-floor stopes about 150 feet. A raise had been put up from the 900 level for a distance of 210 feet. The 1200 and 1600 levels were connected by a completed raise. The 1200 level had been drifted about 325 feet and the 1600 level 920 feet. The average width of the vein between the 600 and 900 levels was 9.6 feet; between the 900 and 1200 levels 12.9 feet; and between the 1200 and 1600 levels 14.6 feet. It was reasonable to assume at September 30, 1915, that the commercial ore in the Intermediate vein would extend a substantial distance above the 600 level and below the 1600 level.

A reasonable rate of mining the ore in the Intermediate vein at September 30, 1915, was 175,000 tons per year, and the reasonably expected life of the vein was in excess of 10 years. Plant and equipment to mine and beneficiate 175,000 tons annually would have cost $300,000. Ore from the Intermediate vein assayed 6.7702 ounces of silver per ton and 9.875 percent of lead. The average price of lead in 1913 was 4.673 cents per pound and the average price of silver in that year was 49.684 cents per ounce. The average price of lead over the period from 1896 to 1915 was 4.326 cents per pound and that of silver was 57.831 cents per ounce. Over the period 1916 to 1933 the average price of lead was 6.476 cents per pound and over the period 1916 to 1935 the average price of silver was 68.538 cents per ounce. Prices reasonably to be expected in 1915 for a number of years thereafter were 4.5 cents per pound for lead and 65 cents per ounce for silver. Mining costs varied with the selling price of the metals, due partly to a system of bonuses to employees. At the expected prices of 4.5 cents for lead and 65 cents for silver, mining costs averaged $3.05 per ton and the reasonably expected profit amounted to $5.4051 per ton of ore in the Intermediate vein. The facts known and reasonably to be expected at September 30, 1915, establish that at that date the Intermediate ore was of a quantity and value that it could be separately mined and marketed at a profit. That date then becomes the effective date of discovery. Art. 240 (e) Regulations 74.

Counsel for the respondent place considerable stress on the petitioner's failure to advise its stockholders in published annual reports of the discovery of the Intermediate vein, and on its failure to mention the discovery in various refund claims filed with the Commissioner. The annual reports to stockholders set forth in most general terms only the result of each prior year's operations. They do not purport to be geological reports, and, as counsel for the petitioner points out, the stockholders were not interested in the number of veins disclosed. Moveover, we do not see in the annual reports as clear an indication as does the respondent that petitioner's officers

had any conviction that there was but one vein. For instance, in the annual report covering operations for 1913 there appears this statement:

We started to drift on the 900 foot level to undercut this east ore, and in doing so, we unexpectedly encountered ore within three hundred and fifty feet of the old shoot.

We see no expression in this to affirm a belief that this new ore body was an extension of the old. The "unexpectedly" finding of an ore body 350 feet from the "old shoot" rather sustains the view of a statutory discovery. In the 1915 annual report it is stated:

The development on the 1200 foot level was practically all in ore, which appears to be an extension of our old orebody. The work on the 600 foot level also discloses this same extension.

We are unable to construe this as an unequivocal declaration of a conviction of the existence of only one vein. The expression "appears to be an extension" may as well be taken as one of doubt. The refund claims referred to by the respondent were filed in connection with petitioner's claim for a revaluation of its ore deposits as of March 1, 1913, and in some of the later ones claim was made for discovery value on the Hecla vein below the 2400 level. These matters are not in issue here. If there was error in the annual reports and the refund claim, the most serious charge to be made is that it was an error of omission; at least we find nothing in them which misled the respondent and which would operate to estop the petitioner from claiming discovery of the Intermediate vein. In considering respondent's claim of estoppel it must be borne in mind that not until the enactment of the Revenue Act of 1926, enlarging the scope of the discovery provisions, was the petitioner in any position to claim discovery of the Intermediate vein.

Holding that the petitioner made a statutory discovery, we come to the matter of valuation. The statute, quoted above, provides for depletion allowances on the basis of "the fair market value of the property at the date of discovery or within thirty days thereafter." This statutory provision requires the determination of the fair market value of the Intermediate vein at September 30, 1915, or within 30 days thereafter. On this phase of the case the petitioner offered a considerable volume of evidence; the respondent offered none. Witnesses for the petitioner, in arriving at their opinions of value, took into account the facts in evidence including, among others, the amount of developed and probable ore in the vein, the per ton mineral content of the mine, costs of developing and mining, and prices current and expected for the minerals. The evidence amply supports the items taken into consideration by the witnesses as factors in reaching their conclusions. Subsequent operations demonstrate the soundness

of the principal factors. For instance, the ore contents were estimated at 2,548,000 tons. From 1913 to 1934, inclusive, 2,504,037 tons were mined and the vein is not yet exhausted. Actual metal prices have exceeded those used as estimates. Recoveries of lead per ton of ore have exceed the estimated 183.554 pounds. Considering all the evidence, including particularly the tonnage of ore developed and probable, the recoverable metal content of the ore, the prices of metals, known and estimated costs of development, mining, and smelting, and the rate of production, we have concluded that a reasonable estimate of the fair market value of the Intermediate vein at September 30, 1915, was $6,500,000. Based on a reasonably estimated ore tonnage of 2,548,000 and a recoverable lead content of 467,695,592 pounds figured at 183.554 pounds per ton, a reasonable allowance for depletion is 1.39 cents per pound of lead produced and sold.

This brings us to the question of the amount of depletion allowable. Depletion deductions heretofore allowed were computed at the rate of 1.33 cents per pound of lead in the shipping product. There is no question on either side as to the correctness of this rate based on the value and tonnage claimed and allowed as of March 1, 1913. The value of $6,400,000 and recoverable ore tonnage of 3,300,338 apply, as we interpret the evidence, only to the Hecla vein and the east ore body. Counsel for the respondent says the record shows that "the so-called Intermediate orebody was included or could have been included" in the March 1, 1913, valuation. The valuation and tonnage arrived at by the parties was ostensibly confined at that time to the Hecla vein and east ore body as known at March 1, 1913. They were based, according to the respondent, on the petitioner's form D and representations in connection therewith. The form D placed in evidence includes maps outlining the ore reserves in the Hecla vein and east ore body upon which the petitioner based its claim for a March 1, 1913, value. Upon an examination of those maps we do not find in them any indication that they included any of the Intermediate ore body, and neither of the parties points to anything which would lead us to believe that it was included. In this situation we feel that the facts previously agreed on by the parties should not be disturbed and that the March 1, 1913, value and tonnage should be treated as confined to the Hecla and east ore bodies.

We are further of the opinion that the depletion deductions heretofore allowed and those allowable on the facts found herein should not be affected by reason of the fact that part of the ore for which deductions were allowed in and prior to 1926 came from the Intermediate vein. It appears that from 1913 on through the taxable years

ore was mined from both the Hecla and Intermediate veins, mixed in the mine and the shipping product sold without distinction as to the source. Depletion was claimed and allowed for the metal produced from both veins at the unit rate of 1.33 cents which had been established for the Hecla vein. Had the petitioner reported the finding of an additional ore body within its mine, the effect would have been to lower the rate of depletion under the so-called principle of dilution. This would not have changed the March 1, 1913, value. That value would remain constant whether the amount of ore in the mine proved to be more or less than the estimated tonnage on which it was based. By dilution and the consequent lowering of the unit rate, the period for exhaustion of the Hecla vein would simply have been extended beyond the year 1926. As matters now stand the value attributable to the Hecla vein and East ore body was exhausted in 1926 and the deductions allowed in and prior to that year can not be adjusted. Neither can the petitioner extend that value into later years and procure deductions therefor even though the ore is not exhausted. Under the statutes prior to the 1926 Act the petitioner would be entitled to no further deductions in respect of its Hecla mine after exhaustion of its March 1, 1913, value regardless of the amount of ore remaining in the old vein or the discovery of new ore bodies within the mine. But upon the change of the statute the petitioner became entitled to additional depletion deductions by reason of discovering the Intermediate vein, based on the value of the discovered vein. In other words, the statute gave the petitioner a new amount to exhaust over succeeding years. Had the petitioner removed sufficient ore from the discovery vein prior to the taxable years to exhaust the discovery value, some question of estoppel might arise. That situation does not exist here. From 1913 to January 1, 1925 (the effective date of the Act of 1926), the petitioner mined only 987,856 tons of ore from the Intermediate vein, leaving at the latter date 1,560,144 tons of the estimated 2,548,000 tons. At the beginning of 1928, the first taxable year before us, there remained 1,119,234 tons of the estimated contents. The statute, as we interpret it and apply it to the facts in this case, gives the petitioner the right to depletion deductions on a discovery value of $6,500,000. That basis persisted through the taxable years, and is not changed by the fact that an erroneous rate was applied to so much of the ore as was reported as coming from the Hecla vein. Summarizing on this point, we hold that for the years 1928 to 1931, inclusive, the petitioner is entitled to depletion deductions in respect to the Intermediate vein at the rate of 1.39 cents per pound of lead produced and sold from that vein.

The final questions are those of allowances for taxes. In the original petition filed in Docket No. 69916 petitioner claimed a deduction of $4,110.47 for 1928 as property taxes paid to Shoshone County. At the hearing evidence was put in showing payment of taxes in the amount claimed, but no claim therefor is made in the amended petition and that item is not discussed in the brief. It would appear that this claim has been abandoned; if not, we are of the opinion that the deduction is not allowable on the evidence produced at the hearing. The petitioner's books were kept on the accrual basis, and there is no showing of when these taxes became due so as to become an accruable and deductible item. A taxpayer on the accrual basis is entitled to deduct taxes in the year they accrue rather than in the year of payment. *United States* v. *Anderson*, 269 U. S. 422. *Crown Willamette Paper Co.*, 14 B. T. A. 133.

The amounts set out in our findings as income taxes paid to the Dominion of Canada are the amounts stipulated by the parties. It appears from the discussion of this matter at the hearing that at the time of accrual of these taxes for the years 1930 and 1931 the petitioner was resisting payment and they were not actually paid until 1934. It being stipulated that the taxes were income taxes applicable to income for 1930 and 1931, they were accruable for those years, and credits are allowable therefor under section 131 of the Revenue Act of 1928. That section provides in subsection (a) (1) for credits to domestic corporations for income taxes paid to foreign countries, with certain limitations set out in subsection (b). The amounts paid are given in Canadian money. The parties have stipulated that in determining the amounts paid in American money the rates of exchange set forth in I. T. 2556, Internal Revenue Bulletin X–1, p. 128, and I. T. 2613, Internal Revenue Bulletin XI–1, p. 47, may be used.

Reviewed by the Board.

*Decision will be entered under Rule 50.*